**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| THE CULTURAL LANDSCAPE FOUNDATION, et al., | |
| *Plaintiffs*, | Civil Action No. 1:26-cv-01593-CJN |
| v. | Hon. Carl J. Nichols |
| U.S. DEPARTMENT OF THE INTERIOR, et al., | |
| *Defendants*. | |

**DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFFS' EMERGENCY MOTION FOR A TEMPORARY RESTRAINING ORDER, PRELIMINARY INJUNCTION, AND/OR STAY OF AGENCY ACTION**

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................ 1

BACKGROUND ................................................................................................................. 2

    I.      FACTUAL AND PROCEDURAL BACKGROUND............................................ 2

            A.      The pool's longstanding dark color and maintenance issues..................... 2

            B.      The current project: NPS addresses significant leaking problems
while maintaining the pool's dark color ....................................................... 4

            C.      NHPA and NEPA compliance for the project ........................................... 5

            D.      This lawsuit.................................................................................................. 6

    III.    LEGAL BACKGROUND ...................................................................................... 7

            A.      National Historic Preservation Act ............................................................ 7

            B.      National Environmental Policy Act ............................................................ 8

            C.      Administrative Procedure Act...................................................................... 9

LEGAL STANDARD......................................................................................................... 10

ARGUMENT ...................................................................................................................... 11

    I.      Plaintiffs lack standing........................................................................................ 11

            A.      Charles Birnbaum has not suffered an Article III injury .......................... 12

            B.      CLF has not suffered an Article III injury ................................................. 14

             C.      Both Plaintiffs fail to establish redressability ........................................... 17

    II.    Plaintiffs make no clear showing of irreparable harm......................................... 18

    III.    Plaintiffs are not likely to succeed on the merits ................................................. 24

            A.      Defendants complied with the NHPA......................................................... 24

            B.      Defendants complied with NEPA............................................................... 28

    III.    The balance of equities and public interest weigh against injunctive relief ......... 31

    IV.    Plaintiffs should be required to post bond if the Court grants injunctive
relief....................................................................................................................... 32

i

CONCLUSION................................................................................................................ 33

## TABLE OF AUTHORITIES

**Other Authorities**

*Alcresta Therapeutics, Inc. v. Azar,*
  318 F. Supp. 3d 321 (D.D.C. 2018)....................................................................... 21

*Am. Great Lakes Ports Ass'n v. Schultz,*
  962 F.3d 510 (D.C. Cir. 2020).............................................................................. 20

*Am. Legion v. Am. Humanist Ass'n,*
  588 U.S. 29 (2019)................................................................................................ 13

*Balt. Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.,*
  462 U.S. 87 (1983).................................................................................................. 9

*Brennan Ctr. for Just. at NYU Sch. of L. v. Dep't of Com.,*
  498 F. Supp. 3d 87 (D.D.C. 2020)........................................................................ 24

*Calif. Ass'n of Priv. Postsecondary Schs. v. DeVos,*
  344 F. Supp. 3d 158 (D.D.C. 2018)...................................................................... 18

*\*Chaplaincy of Full Gospel Churches v. England,*
  454 F.3d 290 (D.C. Cir. 2006)........................................................ 18, 19, 20, 21, 22

*City of Alexandria. v. Slater,*
  198 F.3d 862 (D.C. Cir. 1999)................................................................................ 7

*City of Port Isabel v. Fed. Energy Regul. Comm'n,*
  130 F.4th 1034 (D.C. Cir. 2025)........................................................................... 20

*CityFed Fin. Corp. v. Off. of Thrift Supervision,*
  58 F.3d 738 (D.C. Cir. 1995)................................................................................ 18

*Coal. of 9/11 Fams., Inc. v. Rampe,*
  2005 WL 323747 (S.D.N.Y. Feb. 8, 2005)........................................................... 28

*Ctr. for Pub. Integrity v. U.S. Dep't of Def.,*
  411 F. Supp. 3d 5 (D.D.C. 2019).......................................................................... 24

*Cultural Heritage Partners v. GSA,*
  No. 1:25-cv-3969 (D.D.C.)..................................................................................... 1

*DC Preservation League v. U.S. Dep't of the Interior,*
  No. 1:26-cv-477 (D.D.C.)....................................................................................... 1

*Diamond v. Charles,*
  476 U.S. 54 (1986)................................................................................................ 14

*Dine Citizens Against Ruining Our Env't v. Bernhardt,*
  923 F.3d 831 (10th Cir. 2019) ............................................................................... 8

*\*Env't Def. Fund v.Fed. Energy Regul. Comm'n,*
  2 F.4th 953 (D.C. Cir. 2021)................................................................................. 13

*FDA v. All. for Hippocratic Med,
  602 U.S. 367 (2024).............................................................................................. 13, 15

Fisheries Survival Fund v. Jewell,
  236 F. Supp. 3d 332 (D.D.C. 2017)........................................................................ 18

Food & Water Watch, Inc. v. Vilsack,
  808 F.3d 905 (D.C. Cir. 2015)........................................................................... 14, 15

Friends of Animals v. Jewell,
  828 F.3d 989 (D.C. Cir. 2016).................................................................................. 23

Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.,
  528 U.S. 167 (2000)........................................................................................... 12, 14

Harris Cnty. v. Kennedy,
  786 F. Supp. 3d 194 (D.D.C. 2025).......................................................................... 10

Humane Soc'y of U.S. v. Babbitt,
  46 F.3d 93 (D.C. Cir. 1995)...................................................................................... 14

Indian River Cnty. v. U.S. Dep't of Transp.,
  945 F.3d 515 (D.C. Cir. 2019)..................................................................................... 9

Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity,
  878 F.3d 371 (D.C. Cir. 2017).................................................................................. 17

Karst Envt. Educ. & Prot., Inc. v. EPA,
  475 F.3d 1291 (D.C. Cir. 2007).................................................................................. 9

Katz v. Georgetown Univ.,
  246 F.3d 685 (D.C. Cir. 2001).................................................................................. 10

League of United Latin Am. Citizens v. Exec. Off. of the President,
  780 F. Supp. 3d 135 (D.D.C. 2025).......................................................................... 10

Lemmon v. Trump,
  No. 1:26-cv-544 (D.D.C.)............................................................................................ 1

Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania,
  591 U.S. 657 (2020)........................................................................................... 28, 30

Marsh v. Or. Nat. Res. Council,
  490 U.S. 360 (1989).................................................................................................... 9

Mazurek v. Armstrong,
  520 U.S. 968 (1997).................................................................................................. 10

Munaf v. Geren,
  553 U.S. 674 (2008).................................................................................................. 10

N. Am.'s Bldg. Trades Unions v. Dep't of Def.,
  783 F. Supp. 3d 290 (D.D.C. 2025).......................................................................... 31

*Nken v. Holder*,
  556 U.S. 418 (2009) ................................................................................................ 10

*Oglala Sioux Tribe v. U.S. Nuclear Regul. Comm'n*,
  45 F.4th 291 (D.C. Cir. 2022) .................................................................... 24, 25, 28

*Open Top Sightseeing USA v. Mr. Sightseeing, LLC*,
  48 F. Supp. 3d 87 (D.D.C. 2014) ............................................................................ 18

*Pennsylvania v. DeVos*,
  480 F. Supp. 3d 47 (D.D.C. 2020) .......................................................................... 11

*Protect Democracy Project, Inc. v. U.S. Dep't of Just.*,
  498 F. Supp. 3d 132 (D.D.C. 2020) ........................................................................ 24

*Pursuing Am.'s Greatness v. Fed. Election Comm'n*,
  831 F.3d 500 (D.C. Cir. 2016) ................................................................................ 31

*Robertson v. Methow Valley Citizens Council*,
  490 U.S. 332 (1989) .................................................................................................. 9

*S. Airways Express, LLC v. U.S. Dep't of Transp.*,
  159 F.4th 50 (D.C. Cir. 2025) .................................................................................. 9

*Schindler Elevator Corp. v. Wash. Metro. Area Transit Auth.*,
  514 F. Supp. 3d 197 (D.D.C. 2020) ................................................................... 11, 17

*\*Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*,
  605 U.S. 168 (2025) ................................................................................ 8, 9, 29, 30

*Sierra Club v. EPA*,
  793 F. Supp. 3d 158 (D.D.C. 2025) ........................................................................ 18

*Simon v. E. Ky. Welfare Rights Org.*,
  426 U.S. 26 (1976) .................................................................................................. 15

*Summers v. Earth Island Inst.*,
  555 U.S. 488 (2009) ........................................................................................... 15, 23

*TransUnion LLC v. Ramirez*,
  594 U.S. 413 (2021) .......................................................................................... 13, 17

*Travelers United, Inc. v. Hyatt Hotels Corp.*,
  761 F. Supp. 3d 97 (D.D.C. 2025) .......................................................................... 14

*Trump v. CASA, Inc.*,
  606 U.S. 831 (2025) ................................................................................................ 32

*United Keetoowah Band of Cherokee Indians in Okla. v. FCC*,
  933 F.3d 728 (D.C. Cir. 2019) .................................................................................. 7

*Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*,
  454 U.S. 464 (1982) .......................................................................................... 12, 13

v

*Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc.*,
  559 F.2d 841 (D.C. Cir. 1977) .................................................................... 10

*WildEarth Guardians v. Jewell*,
  738 F.3d 298 (D.C. Cir. 2013) ...................................................................... 9

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) ....................................................................... 10, 22, 31

*Wis. Gas Co. v. Fed. Energy Regul. Comm'n*,
  758 F.2d 669 (D.C. Cir. 1985) ................................................................... 18

*Zayas v. Aviles-Ramos*,
  2025 WL 3442925 (S.D.N.Y. Dec. 1, 2025) ............................................ 22

**Statutes**

16 U.S.C § 470f ................................................................................................ 7

42 U.S.C. § 4332(2)(C) ................................................................................... 8

42 U.S.C. § 4336(a)(2) .................................................................................... 9

42 U.S.C. § 4336(b) ........................................................................................ 8

42 U.S.C. § 4336(b)(1) .................................................................................... 8

42 U.S.C. § 4336(b)(2) .................................................................................... 8

5 U.S.C. § 705 ............................................................................................ 6, 10

5 U.S.C. § 706(2)(A) ....................................................................................... 9

54 U.S.C. § 300320 .......................................................................................... 7

54 U.S.C. § 306108 .................................................................................... 7, 23

**Rules**

Fed. R. Civ. P. 65(c) ...................................................................................... 32

**Regulations**

36 C.F.R. § 800.11(e) .................................................................................... 16

36 C.F.R. § 800.14 ........................................................................................... 7

36 C.F.R. § 800.14(b) ................................................................................... 25

36 C.F.R. § 800.14(b)(iv) .............................................................................. 25

36 C.F.R. § 800.2(c) .................................................................................. 7, 25

36 C.F.R. § 800.2(c)(5) ............................................................................ 15, 21

36 C.F.R. § 800.2(d)(1)-(2) ....................................................................... 15, 21

36 C.F.R. § 800.3 ................................................................................... 5, 7, 15

36 C.F.R. § 800.3(f)(3) ........................................................................................... 21

36 C.F.R. § 800.4 ..................................................................................................... 7

36 C.F.R. § 800.5 ..................................................................................................... 7

36 C.F.R. § 800.5(c) ............................................................................................... 16

36 C.F.R. § 800.6 ..................................................................................................... 7

36 C.F.R. § 800.6(a)(3) ..................................................................................... 16, 23

36 C.F.R. § 800.6(a)(4) ........................................................................................... 16

36 C.F.R. § 800.6(c) ............................................................................................... 16

36 C.F.R. §§ 800.3-800.6 ....................................................................................... 21

36 C.F.R. Part 800 (2026) ........................................................................................ 7

43 C.F.R. § 46.205 ................................................................................................... 9

43 C.F.R. § 46.205(a) ......................................................................................... 9, 29

43 C.F.R. § 46.205(f) .......................................................................................... 9, 29

43 C.F.R. § 46.215 ................................................................................................. 29

91 Fed. Reg. 8738 .................................................................................................. 22

## INDEX OF EXHIBITS

| Exhibit | Description |
|---|---|
| | Declaration of Dr. Kevin Greiss |
| A | National Park Service Cultural Landscapes Inventory 2022 (Lincoln Memorial National Mall and National Parks) |
| B | National Park Service Cultural Landscapes Inventory 2023 (West Potomac Park National Mall & National Parks) |
| C | Rehabilitation of the Lincoln Memorial Reflecting Pool And Surrounding Area – Environmental Assessment (2009) |
| D | Finding of No Significant Impact - Rehabilitation of the Lincoln Memorial Reflecting Pool And Surrounding Area (2010) |
| E | Lincoln Memorial Reflecting Pool – Investigation of Structural Condition and Causes to Water Loss Event (2013) |
| F | Categorical Exclusion Documentation Form (March 31, 2026) |
| G | Assessment of Actions Having an Effect on Historic Properties (March 31, 2026) |
| H | Programmatic Agreement Among the National Park Service, the Advisory Council on Historic Preservation, and the National Conference of State Historic Preservation Officers for Compliance with Section 106 of the National Historic Preservation Act (2008) |
| I | Letter from C. Andrew Lewis to Kevin Greiss (April 28, 2026) |
| J | Letter from Jennifer Nersesian to C. Andrew Lewis (April 29, 2026) |
| K | Letter from Jennifer Nersesian to Reid Nelson (April 29, 2026) |
| L | Letter from Reid Nelson to Jennifer Nersesian (May 4, 2026) |

**INTRODUCTION**

National Park Service-hired ("NPS") contractors are fixing leaks in the Lincoln Memorial Reflecting Pool ("Reflecting Pool").  When they're finished, the bottom of the pool will be dark blue.  Plaintiffs prefer the pool's previous color: dark gray.  That preference, in Plaintiffs' view, amounts to an emergency.  These sorts of manufactured offended-observer emergencies are becoming more and more common.[1]  For example, this is not even the first emergency related to the color of a structure on government property.  *See Cultural Heritage Partners v. GSA*, No. 1:25-cv-3969 (D.D.C.), Dkt. No. 7 (emergency motion to stop the cleaning and painting of the Eisenhower Executive Office Building, despite no final agency action approving such a project).

This emergency motion—and the lawsuit itself—is meritless.  Plaintiffs have a fatal irreparable-harm problem because the pool's ultimate color will be reversible with additional coats of epoxy primer and tinted coating.  It's also possible that Plaintiffs will have no problem with pool's final color: their whole theory of the case wrongly assumes (based on a series of inaccurate news articles and satirical social media posts) that the Reflecting Pool will ultimately look like a swimming pool that you see at a resort or theme park.  That's not true.  Regardless, an abstract disagreement over color does not amount to an Article III injury.  And it definitely doesn't amount to an irreparable injury, especially since Plaintiffs waited several weeks after learning about the project to bring suit and ask the Court to stop the project midstream.  Plaintiffs

---

[1] *See, e.g.*, *Lemmon v. Trump*, No. 1:26-cv-544 (D.D.C.), Dkt. No. 7 (emergency motion to stop construction of an arch on Memorial Circle, despite no final agency action approving such a project); *DC Preservation League v. U.S. Dep't of the Interior*, No. 1:26-cv-477 (D.D.C.), Dkt. No. 8 (same for a potential renovation of the East Potomac Golf Course).

point to purported violations of procedural statutes, but those bare procedural violations cannot bridge this standing gap.

Plaintiffs do no better on the merits. They again rely on a counterfactual—that NPS wholesale ignored the National Historic Preservation Act ("NHPA") and the National Environmental Policy Act ("NEPA"). It did not. The agency conducted a streamlined consultation under NHPA and determined that a Categorical Exclusion applied under NEPA. This makes sense—and, at a minimum, is reasonable—because the project is routine maintenance and repair that will have trivial aesthetic and environmental impact.

The Court should deny Plaintiffs' motion and dismiss the case.

## BACKGROUND

### I.    Factual and procedural history

The Reflecting Pool sits between the Lincoln Memorial and the World War II Memorial on the National Mall in Washington, D.C. It is about 2,000 feet long, 160 feet wide, and three feet deep. Granite lines the pool's edge. Declaration of Dr. Kevin Greiss ("NPS Decl.") at ¶ 21. The basin of the pool is a concrete slab, which sits on a timber frame. *Id*. at ¶ 10.

### A.    The pool's longstanding dark color and maintenance issues

True to its name, the pool reflects (depending on one's vantage point) the Lincoln Memorial, the Washington Memorial, nearby trees, and the sky. The Reflecting Pool achieves this effect through intentional design features that have varied across time. As originally built, the pool floor surface consisted of an asphalt-coated membrane, dark slate, and concrete tile intended to make the water reflective. Ex. J, NPS Letter re: Section 106 Review of the Repainting of the Lincoln Memorial Reflecting Pool (dated Apr. 29, 2026), at 1–2. NPS later replaced the original pool floor surface with "dark tinted" concrete, designed to "enhance the

2

reflection of the pool." NPS Decl. at ¶ 11. Before the project at issue began, the floor of the pool was dark gray—and often green-brown, due to algae and sediment buildup. NPS Decl. at ¶ 15. Although the material and color of the pool surface has changed many times, the unifying thread in every iteration of the design has been a dark pool to maintain the reflective quality of the water.

The Reflecting Pool has seen many other repairs and renovations during its 102-year existence. Ex. E, Lincoln Memorial Reflecting Pool Investigation of Structural Condition and Causes to Water Loss Event at 3; *see also* Ex. C, Rehabilitation of the Lincoln Memorial Reflecting Pool and Surrounding Area Environmental Assessment at 1-5. Water quality and leaks have been consistent problems. The pool was resealed for the first time in 1929. Ex. A, NPS Cultural Landscape Inventory 2022 at 148. In 1981, NPS reconstructed the pool and installed a new system to help maintain the pool's water quality and address leakage. *Id*. at 190. In 2012, NPS conducted another major renovation of the Reflecting Pool, which rebuilt and replaced the entire Reflecting Pool and installed a new water supply system, drawing water from the Tidal Basin rather than the city grid. *Id.* at 195–96; NPS Decl. at ¶ 10. The essential features of this icon (the granite coping stones and reflective quality) have remained constant across time, but renovation and repair have been constant, too.

After the 2012 renovation, NPS again discovered leaks in the Reflecting Pool—as much as 500,000 gallons over a two-week period in January 2013—and recommended repairs to the expansion joints (i.e., separations between sections of concrete designed to accommodate expansion and contraction due to temperature) in the slab and around the perimeter. Ex. E at 2, 16. NPS estimates that, in recent years, approximately 25 million gallons leaked from the Reflecting Pool annually. NPS Decl. at ¶ 13. The water quality issues have persisted, too. NPS

3

regularly drains and cleans the Reflecting Pool to remove algae, sediments, and wildlife excrement. *Id.* at ¶ 15.

B.      **The current project: NPS addresses significant leaking problems while maintaining the pool's dark color**

In late March 2026, NPS approved the project that Plaintiffs challenge here, a project intended first and foremost to address the persistent leakage and water quality issues in the Reflecting Pool. Ex. G, Assessment of Actions Having an Effect on Historic Properties (dated Mar. 30, 2026) at 1; NPS Decl. at ¶ 29. NPS intended to remove and replace the failed expansion joints and—in order to prolong the useful life of the pool basin—install a polyurea and epoxy liner[2] to "waterproof and protect the concrete pool surface." Ex. G at 1. NPS further expected the liner to inhibit algae growth. NPS Decl. at ¶ 21. The project first required cleaning and sandblasting the pool floor and walls; then replacing expansion joints and caulking cracks; and finally applying polyurea and epoxy to the expansion joints, floor, and walls of the pool. Ex. G at 1. The treatment will maintain the pool's dark color; it is a very dark, navy, "American Flag" shade of blue. Ex. G at 1; NPS Decl. at ¶¶ 22-23.

News articles wrongly announced that the new color of the pool would resemble a swimming pool, apparently based on the primer layer rather than the finished product. Ex. J at 1, 3, 5. In reality, the final color will be dark and low in chroma,[3] intended to maintain the mirror-like surface of the Reflecting Pool and consistency with the historic appearance. Ex. J at 2; NPS Decl. at ¶ 21. Once the project is complete, NPS will refill the pool and the public will be

---

[2] Plaintiffs repeatedly say, without explanation, that NPS is "painting" the Reflecting Pool. *See, e.g.*, Dkt. No. 2 at 1. NPS is not painting anything. Epoxy is a polymer that sets and hardens when it cools, and polyurea is a fast-curing, synthetic polymer often used for waterproofing.

[3] "Chroma" refers to the intensity or saturation of color. High chroma denotes a vivid and bold color, while low chroma is a grayish or muted tone.

4

unlikely to see the liner, which sits before the water's surface, due to the reflectivity of the pool. NPS Decl. at ¶ 45. The color, perhaps unsurprisingly, can be reversed or altered. Ex. G at 4; NPS Decl. at ¶ 48.

### C.   NHPA and NEPA compliance for the project

NPS reviewed the project in accordance with the NHPA. NPS concluded that this project amounted to routine maintenance and thus used a streamlined review process set forth in a 2008 Programmatic Agreement (the "Agreement"). NPS Decl. at ¶ 29. NPS consulted with a historic landscape architect from its National Capital Regional Office and concluded that the project would have "no adverse effect" on historic properties. *Id.*; Ex. G at 3. Under the Agreement, this conclusion meant that "no further consultation" was required.[4] NPS Decl. at ¶ 30; Ex. G at 3. NPS also complied with NEPA review. NPS concluded that a categorical exclusion applied because the project consisted of "routine maintenance and repair to an existing cultural resource feature within its current footprint" and there would be no adverse effect on the cultural resource. NPS Decl. at ¶ 26; Ex. F, NPS Categorical Exclusion Documentation Form (CE Form) at 2. NPS further determined that no "extraordinary circumstance" demanded a more detailed review. NPS Decl. at ¶ 27; Ex. F at 4.

Work on the project began in mid-April 2026. The DC State Historic Preservation Office ("DC SHPO") contacted NPS about the project shortly thereafter, under the misimpression that NPS was applying "bright blue paint" to the pool bottom. Ex. I, SHPO Letter re: Section 106 Review of the Repainting the Lincoln Memorial Reflecting Pool (dated Apr. 28, 2026) at 1. NPS

---

[4] Absent a programmatic agreement like the one at issue here, NPS would have been obliged to conduct consultation consistent with the regulations at 36 C.F.R. § 800.3 *et seq. See* Background Section II.A, *infra*. The Agreement provides an alternative, and streamlined, means for NPS to comply with Section 106.

5

responded the following day and explained that the "primary concern identified seems to reflect a misunderstanding based on incorrect information possibly gleaned from erroneous news reports[.]" Ex. J at 1. NPS explained that the "bright blue paint" was primer material, that the final coating would be a "very dark blue, sympathetic with historic coatings and surface finishes on the Reflecting Pool[,]" and that streamlined review processes permitted NPS to undertake this project without consulting the DC SHPO. Ex. J at 1–2. Discussions about this project with the DC SHPO are ongoing. NPS Decl. at ¶ 38.

As it stands, the contractor has finished cleaning the pool surface and is applying epoxy primer. NPS Decl. at ¶ 41. As areas of the pool become fully primed, the contractor will apply the polyurea liner. *Id.* at ¶ 42. The pool cannot retain water while the primer and polyurea liner are being applied because the failed expansion joints have been removed but not yet replaced, but NPS expects that the project will conclude, and the pool will be re-filled, in the coming weeks. NPS Decl. at ¶¶ 45–47.

### D.    This lawsuit

On May 11, 2026, Plaintiffs filed this lawsuit and moved for a temporary restraining order, preliminary injunction, and/or stay of agency action under 5 U.S.C. § 705. *See* Dkt. No. 2. By that point, Plaintiffs had known about the project for two weeks. *See* Dkt. No. 2-1 at 5. And they apparently knew that NPS expected to finish the project by the end of May. *See* Dkt. No. 2 at 5. Yet they waited until the project's apparent waning weeks before requesting emergency relief based (in part) on the project's imminent completion.

## II.    Legal background

### A.    National Historic Preservation Act

Section 106 of the NHPA is "essentially a procedural statute" that does not impose substantive standards but "requires that agencies 'take into account the effect of [an] undertaking on any district, site, building, structure, or object that is included in or eligible for inclusion in the National Register [of Historic Places].'" *City of Alexandria. v. Slater*, 198 F.3d 862, 871 (D.C. Cir. 1999) (alterations in original) (citing 16 U.S.C. § 470f) (1999).[5]  The NHPA defines an undertaking as any "project, activity, or program funded in whole or in part under the direct or indirect jurisdiction of a Federal agency[.]"  54 U.S.C. § 300320.

Advisory Council on Historic Preservation ("Council") regulations govern federal agency compliance with Section 106.  *See* 36 C.F.R. Part 800 (2026).  The regulations set forth a four-step process: (1) initiation (36 C.F.R. § 800.3); (2) identification of historic properties potentially affected (§ 800.4); (3) assessment of any effects, including adverse effects (§ 800.5) ; and (4) efforts to resolve any adverse effects (§ 800.6); *United Keetoowah Band of Cherokee Indians in Okla. v. FCC*, 933 F.3d 728, 745 (D.C. Cir. 2019).  In its full form, the Section 106 process can involve consultation with the Council, state historic preservation offices, tribal historic preservation offices, representatives of local government, and individuals or organizations with a demonstrated interest in the undertaking.  36 C.F.R. § 800.2(c).

In lieu of the multistep formal consultation, however, an agency may use program alternatives.  36 C.F.R. § 800.14.  For example, an agency official may negotiate a programmatic agreement that implements Section 106 obligations.  *Id.* § 800.14(b).  "When a governing programmatic agreement is in place, compliance with the procedures in that agreement satisfies

---

[5] 16 U.S.C § 470f has been recodified to 54 U.S.C. § 306108 as of December 19, 2014.

the agency's NHPA Section 106 responsibilities for all covered undertakings." *Dine Citizens Against Ruining Our Env't v. Bernhardt*, 923 F.3d 831, 846 (10th Cir. 2019). In 2008, NPS—recognizing that park management involved frequent maintenance and repair of culturally and historically significant properties—entered into such an agreement with the Council and the National Conference of State Historic Preservation Officers that applied to park operations. Ex. H, Programmatic Agreement Among the NPS (U.S. Department of the Interior), the Advisory Council on Historic Preservation, and the National Conference of State Historic Preservation Officers for Compliance with Section 106 of the NHPA at 1. For projects that meet certain criteria and have no adverse effect on a historic property, NPS can streamline its NHPA review by conducting an internal assessment of effects and reporting qualifying projects to the Statement Historic Preservation Officer in an annual report. Ex. H at 9–10; NPS Decl. at ¶ 30.

## B. National Environmental Policy Act

NEPA focuses governmental and public attention on potential environmental effects from any proposed "major Federal actions." 42 U.S.C. § 4332(2)(C). Like the NHPA, NEPA imposes "no *substantive* constraints on the agency's ultimate decision," but is a "*purely procedural*" statute—the agency's "only obligation is to prepare an adequate report." *Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*, 605 U.S. 168, 180 (2025). To satisfy NEPA, agencies prepare an environmental review document. 42 U.S.C. § 4336(b). An agency prepares an environmental impact statement for a proposed action "that has a reasonably foreseeable significant effect on the quality of the human environment[,]" *id.* § 4336(b)(1), or an environmental assessment for a proposed action "that does not have a reasonably foreseeable significant effect on the quality of the human environment, or if the significance of such effect is unknown," *id.* § 4336(b)(2).

An agency may also determine that an environmental document is not required if certain exceptions apply, including if an action falls into a categorical exclusion. *Id.* § 4336(a)(2). Categorical exclusions are "a category of actions that . . . normally do not significantly affect the quality of the human environment." 43 C.F.R. § 46.205. If an action meets the criteria for a categorical exclusion, NPS need not prepare an environmental assessment or environmental impact statement. 43 C.F.R. § 46.205(a), (f).

Judicial review of agency NEPA compliance is deferential. *Seven Cnty.*, 605 U.S. at 180; *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 377 (1989). Under NEPA, agencies may decide that "other values outweigh the environmental costs" and may move forward with a proposed action so long as they undergo the necessary process. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989). The court's role is "simply to ensure that the agency has adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary or capricious." *Indian River Cnty. v. U.S. Dep't of Transp.*, 945 F.3d 515, 527 (D.C. Cir. 2019) (citing *WildEarth Guardians v. Jewell*, 738 F.3d 298, 308 (D.C. Cir. 2013)); *Balt. Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 97–98 (1983)).

### C.   Administrative Procedure Act

Because the NHPA and NEPA do not provide a private right of action, the Administrative Procedure Act ("APA") governs judicial review. *See Karst Env't. Educ. & Prot., Inc. v. EPA*, 475 F.3d 1291, 1295 (D.C. Cir. 2007). The APA authorizes a reviewing court to "hold unlawful and set aside" final agency actions found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *Marsh*, 490 U.S. at 378. Arbitrary and capricious review is narrow in scope and deferential in nature. *S. Airways Express, LLC v. U.S. Dep't of Transp.*, 159 F.4th 50, 58–59 (D.C. Cir. 2025).

9

**LEGAL STANDARD**

A "preliminary injunction is an 'extraordinary and drastic remedy.'" *Munaf v. Geren*, 553 U.S. 674, 689–90 (2008) (citation omitted). An injunction should be entered only "upon a clear showing that the [movant] is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). To obtain a preliminary injunction, the moving party must demonstrate (1) that it is likely to succeed on the merits of its claims; (2) that it is likely to suffer an irreparable injury in the absence of injunctive relief; (3) that the balance of equities tips in its favor; and (4) that the proposed injunction is in the public interest. *Id.* at 20; *see also Katz v. Georgetown Univ.*, 246 F.3d 685, 687–88 (D.C. Cir. 2001). The same substantive standards apply for both temporary restraining orders and preliminary injunctions. *See Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 843 (D.C. Cir. 1977). "The last two factors merge when the government is a party." *Harris Cnty. v. Kennedy*, 786 F. Supp. 3d 194, 203 (D.D.C. 2025) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)). A movant "has the burden to show that all four [*Winter*] factors, taken together, weigh in favor of the injunction." *League of United Latin Am. Citizens v. Exec. Off. of the President*, 780 F. Supp. 3d 135, 169 (D.D.C. 2025) (alteration in original) (citation omitted). Preliminary injunctive relief "should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (citation omitted).

Similarly, 5 U.S.C. § 705 directs that a reviewing court, "to the extent necessary to prevent irreparable injury, . . . may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings." *Id.* The factors governing the issuance of a preliminary injunction "also govern

10

the issuance of a stay under Section 705 of the APA." *Pennsylvania v. DeVos*, 480 F. Supp. 3d 47, 58 (D.D.C. 2020) (citation omitted).

When considering a motion for a preliminary injunction, if it becomes apparent to the court that it lacks jurisdiction over a plaintiff's claims, the court may dismiss those claims in whole or in part. *See, e.g.*, *Schindler Elevator Corp. v. Wash. Metro. Area Transit Auth.*, 514 F. Supp. 3d 197, 212 (D.D.C. 2020) (denying plaintiff's motion for preliminary injunction and dismissing plaintiff's claims sua sponte after concluding plaintiff was not entitled to any relief), *aff'd,* 16 F.4th 294 (D.C. Cir. 2021).

## ARGUMENT

As an initial matter, Plaintiffs' offended observer status and purportedly lost procedural opportunities do not suffice for standing, and this Court therefore lacks jurisdiction. Because Plaintiffs fail to allege an injury-in-fact in the first instance, they also fail to allege an imminent, irreparable injury—all the more so because any alleged injuries are reversible. NPS reasonably concluded that this routine maintenance project could be subject to streamlined review under the NHPA and NEPA. And Plaintiffs' requested relief, which would require the Reflecting Pool to remain dry and empty during the pendency of this litigation, would inflict more aesthetic harm on the public (and Plaintiffs) than denying the injunction.

## I.    Plaintiffs lack standing

To have Article III standing, a plaintiff must show that "(1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable

11

decision." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000).  Both plaintiffs fail to clearly show that they have standing.

### A.    Charles Birnbaum has not suffered an Article III injury

Plaintiffs fail to establish standing by way of CLF's Founding President and CEO, Charles Birnbaum.  A plaintiff can allege injury in fact if he "use[s] the affected area" and is someone "for whom the aesthetic and recreational values of the area will be lessened by the challenged activity." *Friends of the Earth*, 528 U.S. at 183 (citation omitted).  Conversely, the "psychological consequence . . . produced by observation of conduct with which [one] disagrees . . . is not an injury sufficient to confer standing." *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 485 (1982).

Here, Mr. Birnbaum avers that he visits the Reflecting Pool on a monthly basis, and that he has a "heightened appreciation" for the "grey, achromatic" color of the Reflecting Pool's basin. Dkt. No. 2-1 at 8–9.  Mr. Birnbaum further avers that his enjoyment of the pool's "seamless and luminous plane" and "profound reflective depth" would be harmed because NPS is "painting the basin blue," which will change the pool's appearance, and which causes him an ongoing aesthetic injury. *Id*. at 9.

There are two problems with Mr. Birnbaum's theory of standing.  First, it is grounded in fiction rather than fact.  Mr. Birnbaum's understanding that the Reflecting Pool will be made to resemble a waterpark appears to be founded upon inaccurate news reports, which made pronouncements about the end result based on the color of the initial coat of primer.  NPS Decl. at ¶ 34; Ex. J. at 1.  Mr. Birnbaum would have the Court believe the pool is sky blue, but he has made no clear showing to that effect.  By contrast, NPS has submitted a sworn declaration that says the pool basin will be dark and achromatic.  NPS Decl. at ¶¶ 22-23.  Because the premise of

12

Mr. Birnbaum's alleged injury is that the pool basin will no longer be dark and low chroma, Mr. Birnbaum has failed to make a clear showing that he will be harmed by an offensive, "vivid blue" color. That alone is fatal to his standing.

Second, Mr. Birnbaum's alleged aesthetic injury is too hypothetical and conjectural to suffice for Article III standing. An aesthetic injury must be concrete like any other. *See TransUnion*, 594 U.S. at 417. When a plaintiff alleges aesthetic harm from a project, he must show that his "specific aesthetic interests" are harmed, by describing his particular "use[] and enjoy[ment] [of] the land" beyond "mere incidental viewership," and he must further identify how he will have to "alter[] [his] behavior." *Env't Def. Fund v. Fed. Energy Regul. Comm'n*, 2 F.4th 953, 969–70 (D.C. Cir. 2021). Thus, the D.C. Circuit held that a plaintiff lacked standing when she did "not even allege that she c[ould] see the new [construction] from her property," which was more than "half a mile" away, and attested only that "she must look at an 'eyesore' several times per week while driving past." *Id.* at 968, 970 (internal citation omitted). As this Court observed, there is "nothing in the existing case law to suggest that a person who incidentally views something unpleasant has suffered an injury-in-fact." *Id.* at 970. Such an injury is instead purely *psychic* in nature, which is insufficient. *See Valley Forge*, 454 U.S. at 485.

This is all Mr. Birnbaum has. His objections—no matter how deeply felt—are the sort of "general legal, moral, ideological, or policy objection to a particular government action" that "Article III standing screens out." *All. for Hippocratic Med.*, 602 U.S. at 381. This "'offended observer' theory of standing has no basis in law," *Am. Legion v. Am. Humanist Ass'n*, 588 U.S. 29, 80 (2019) (Gorsuch, J., concurring), because "[t]he presence of a disagreement, however sharp and acrimonious it may be, is insufficient by itself to meet Art. III's requirements,"

13

*Diamond v. Charles*, 476 U.S. 54, 62 (1986).  Given that the pool will retain its dark basin and reflective character, it is unclear how Mr. Birnbaum's use and enjoyment of, or aesthetic interests in, the Reflecting Pool could possibly be affected.  Mr. Birnbaum's concerns about a finished product that may not meet his design preferences are based on inaccurate facts and are too hypothetical to confer jurisdiction.  *Friends of the Earth*, 528 U.S. at 180–81.  And to the extent Mr. Birnbaum's alleged aesthetic injuries are not visible to the naked eye, they are too abstract for standing purposes.  *See generally Humane Soc'y of U.S. v. Babbitt*, 46 F.3d 93, 98 (D.C. Cir. 1995) ("[G]eneral emotional 'harm,' no matter how deeply felt, cannot suffice for injury-in-fact for standing purposes.").  Mr. Birnbaum has not established standing through his alleged aesthetic injury.

B.   **CLF has not suffered an Article III injury**

Nor do Plaintiffs establish standing for CLF.  An organization like CLF can demonstrate standing either "on its own behalf," which is called "organizational standing," or "on behalf of its members," which is called "associational standing."  *Travelers United, Inc. v. Hyatt Hotels Corp.*, 761 F. Supp. 3d 97, 111–12 (D.D.C. 2025) (citations omitted).  CLF appears to press only the former theory: it argues that it "has standing based on injuries it has suffered as a result of Defendants' failure to initiate Section 106 review both as a potential participant in the Section 106 review . . . and as a beneficiary of the information generated through the review and on which is [sic] routinely relies in its programming."  Dkt. No. 2 at 8–9.

To determine if an organization has standing to sue in its own right, courts conduct the same inquiry as in the case of an individual plaintiff.  *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 919 (D.C. Cir. 2015).  "[A]n organization's abstract concern with a subject that could be affected by an adjudication does not substitute for the concrete injury required by Art[icle]

14

III." *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 40 (1976).  Rather, an organization must show that the defendant's conduct "directly affected and interfered with [its] core business activities." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 395 (2024).

Furthermore, "the omission of a procedural requirement does not, by itself, give a party standing to sue." *Food & Water Watch*, 808 F.3d at 921 (citation omitted).  Rather, "[d]eprivation of a procedural right without some concrete interest that is affected by the deprivation—a procedural right *in vacuo*—is insufficient to create Article III standing." *Id.* (citation omitted).

Here, CLF complains primarily about its lost opportunity to participate in the Section 106 NHPA review process.  This argument lacks merit.  As an initial matter, CLF has no such rights. *Contra* Dkt. No. 2 at 9.  Assuming that a full Section 106 consultation were required (it was not), CLF would not have been guaranteed consulting party status: it could have requested such status, but its participation as such would be left to the discretion of NPS.  *See* 36 C.F.R. § 800.2(c)(5); 36 C.F.R. § 800.3.  The only participation right guaranteed to CLF in that process is the ability to submit comments.  *See* 36 C.F.R. § 800.2(d)(1)-(2).  And whether CLF would have been a consulting party or member of the public that submitted a comment is ultimately immaterial because each interest is purely procedural.  A lost "procedural right *in vacuo*" does not suffice for standing.  *Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009).

Rather, CLF must tie its claimed procedural right to some concrete harm—specifically, it must show that its lost procedural opportunities directly affected and interfered with its core business activities.  *All. for Hippocratic Med.*, 602 U.S. at 395.  CLF fails to do so.  The only concrete harm CLF identifies is informational: they say that they have been deprived of "valuable information—determinations of effect, memoranda of agreement—that the Section

15

106 process mandates and makes publicly available." Dkt. No. 2 at 10. But whether compliance information is made available to the public hinges on a determination of adverse effect to a historic property, which NPS did not make here. *See* 36 C.F.R. § 800.5(d); 36 C.F.R. § 800.6(a)(3), (4). And more importantly, CLF now has access to the agency's NHPA compliance information.[6] *See* Ex. G. CLF is free to use this information in its educational guides, database entries, and advocacy programs. *See* Dkt. No. 2 at 10. So CLF can identify no interference with its core business activities. *All. for Hippocratic Med.*, 602 U.S. at 395.

Plaintiffs fail to identify other information that would be required under NHPA or its implementing regulations. *See* 36 C.F.R. § 800.6(a)(3), (4) (requiring the agency to provide the documentation specified in § 800.11(e) to consulting parties and the public to resolve a finding of adverse effect); 36 C.F.R. § 800.11(e) (explaining that the information that must be provided is a "[f]inding of no adverse effect or adverse effect"). And simply wanting more information that might be developed or disclosed as a consequence of further process does not suffice. *See, e.g.*, *Found. on Econ. Trends v. Lyng*, 943 F.2d 79, 84–85 (D.C. Cir. 1991) ("[W]e have never sustained an organization's standing in a NEPA case solely on the basis of 'informational injury,' that is, damage to the organization's interest in disseminating the environmental data an

---

[6] Memoranda of agreement are a possible outcome of the Section 106 consultation process, allowing the agency to resolve a finding of adverse effect by signing an agreement with the state historic preservation office and/or Council. *See* 36 C.F.R. § 800.6(c). Because NPS found that the project had no adverse effect on historic properties, even if full Section 106 consultation were undertaken, the consultation would not result in a memorandum of agreement. *See* 36 C.F.R. § 800.5(c) (prescribing the process to resolve disagreements between consulting parties regarding an agency's no adverse effect determination). And, of course, no such agreement exists because the NPS determined that the streamlined review process applied under its nationwide programmatic agreement. *See* Section III.A, *infra*. That agreement also includes a process to resolve disagreements in which Plaintiffs have no role.

impact statement could be expected to contain."); *Ctr. for Biological Diversity v. Bernhardt*, 490 F. Supp. 3d 40, 49 (D.D.C. 2020).

CLF's standing argument focuses on the alleged denial of rights under the NHPA and omits any discussion of NEPA. "[S]tanding is not dispensed in gross; rather, plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021). Thus, if CLF is trying to raise a NEPA claim, the Court lacks jurisdiction to hear it.

## C.    Both Plaintiffs fail to establish redressability

"The plaintiff bears the burden of establishing all three elements of standing." *Elec. Priv. Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*, 878 F.3d 371, 377 (D.C. Cir. 2017). Here, Plaintiffs discuss (albeit fruitlessly) their alleged injuries in fact but omit from the Motion, accompanying declarations, and Complaint any discussion of redressability. And it is unclear how further NHPA or NEPA process would redress Plaintiffs' purported harms when (1) they now have all of the information to which they are entitled and (2) the pool will remain a dark color that preserves its reflective quality.

Plaintiffs fail to make any allegation or argument about redressability, and that further dooms their standing argument.

*      *      *

Plaintiffs lack standing and the Court should dismiss their claims in their entirety now. *See Schindler Elevator Corp.*, 514 F. Supp. 3d at 212. Alternatively, the apparent absence of jurisdiction shows they have little likelihood of success on the merits.

17

## II.    Plaintiffs make no clear showing of irreparable harm

Plaintiffs fail to make a showing of imminent irreparable harm.  The "standard for irreparable harm is particularly high in the D.C. Circuit." *Fisheries Survival Fund v. Jewell*, 236 F. Supp. 3d 332, 336 (D.D.C. 2017).  If a party makes no showing of imminent irreparable injury, the Court may deny the motion for injunctive relief without considering the other factors. *CityFed Fin. Corp. v. Off. of Thrift Supervision*, 58 F.3d 738, 747 (D.C. Cir. 1995); *see Wis. Gas Co. v. Fed. Energy Regul. Comm'n*, 758 F.2d 669, 673–74  (D.C. Cir. 1985) (per curiam).  A showing of imminent irreparable injury "is the *sine qua non* for obtaining a preliminary injunction—it is what justifies the extraordinary remedy of granting relief before the parties have had the opportunity fully to develop the evidence and fully to present their respective cases." *Calif. Ass'n of Priv. Postsecondary Schs. v. DeVos*, 344 F. Supp. 3d 158, 167 (D.D.C. 2018) (citation omitted).

 "[T]he injury must be both certain and great; it must be actual and not theoretical." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) (citation omitted).  And "[t]he possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation weighs heavily against a claim of irreparable harm." *Id*. at 297–98 (citation omitted).

As an initial matter, Plaintiffs' two-week delay in bringing this suit and emergency motion cuts against a finding of imminent irreparable harm.  An "unexcused delay in seeking extraordinary injunctive relief may be grounds for denial because such delay implies a lack of urgency and irreparable harm." *Open Top Sightseeing USA v. Mr. Sightseeing, LLC*, 48 F. Supp. 3d 87, 90 (D.D.C. 2014) (citation omitted); *see also Sierra Club v. EPA*, 793 F. Supp. 3d 158, 165 (D.D.C. 2025).  Here, Plaintiffs were seemingly aware of this project in the middle of April

18

2026. Dkt. No. 2-1 at 5 (noting that CLF emailed NPS about the project on April 27, "several days" after the project "became publicly known"); Dkt. No. 2 at 1 (stating that project began in mid-April). They waited until May 11, 2026, to seek emergency relief, urging the Court to halt the project before it ends (according to them) at the end of the month. The purported two-week fuse is one that Plaintiffs set.

Delay aside, none of Plaintiffs' alleged harms come close to an irreparable injury: Plaintiffs fail to establish any injury in fact, much less such an injury that meets the high standard set forth by the D.C. Circuit. Plaintiffs assert three harms: one aesthetic, one procedural, and one informational. Not one is certain, great, or irreversible. *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297–98.

First, Plaintiffs' aesthetic harm argument is premised on the misunderstanding (likely influenced by inaccurate news reports that discuss the primer color) that the Reflecting Pool is being painted "vivid blue," and once finished, will resemble a swimming pool. Dkt. No. 2 at 18. Not so. The "American Flag" blue-colored polyurea liner will be dark and low chroma. NPS Decl. at ¶¶ 22-23; Ex. J at 2. It was "intentionally selected to maintain the Reflecting Pool's defining characteristic, its mirrorlike surface, and to avoid any appearance inconsistent with its historic setting or its function as a formal commemorative landscape." Ex. J at 2; *see also* NPS Decl. at ¶ 35; Ex. G at 4. To the extent that Plaintiffs quibble about the precise shade chosen— the choice of dark navy versus dark gray or black, *see* Dkt. No. 2-5 at 4—such an alleged aesthetic harm is neither certain nor great. *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297 (citation omitted). The harm is also speculative because the liner will sit below the waterline, and NPS has concluded that dark blue is sympathetic to historic treatments, so the pool will look the same or perhaps even become more reflective (due to a reduction of algae). NPS Decl. at

19

¶¶ 21, 34, 45.  Plaintiffs' subjective disagreement about liner color—premised on a factual misunderstanding—falls well short of the "certain" or "great" harm necessary to support a request for emergency relief.  *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297 (citation omitted).

Equally fatal is that Plaintiffs' alleged aesthetic harm is reversible.  *Contra* Dkt. No. 2 at 18.  Plaintiffs' argument is conclusory and supported by no factual evidence.  NPS, by contrast, has submitted a sworn declaration that says just the opposite: NPS could change the color back to dark gray simply by applying a new coat of epoxy primer and tinted coating to the challenged navy blue treatment.  NPS Decl. at ¶ 48.  And Plaintiffs could theoretically obtain such a remedy in the ordinary course of litigation.[7]  Indeed, Plaintiffs ask the Court, in their Complaint, to "[r]equire Defendants to restore the historic elements of the Reflecting Pool."  Dkt. No. 1 at 26. Because this purported aesthetic harm is reparable, it does not support Plaintiffs' request for emergency relief.  *See Chaplaincy of Full Gospel Churches*, 454 F.3d at 297–98.

Second, Plaintiffs' supposed imminent procedural harm arising from Defendants' use of a categorical exclusion under NEPA and a streamlined review under NHPA is, again, far from "great."  *Id*. at 297 (citation omitted).  Plaintiffs largely conflate their irreparable harm argument with the merits: according to Plaintiffs, if NPS did not abide by the NHPA, they have necessarily

---

[7] To be sure, Defendants disagree that vacatur or specific relief would be the proper remedy in this case.  Rather, courts in this district routinely remand agency actions without vacating them to give the agency a chance to address deficiencies in their process or reasoning. *See, e.g.*, *City of Port Isabel v. Fed. Energy Regul. Comm'n*, 130 F.4th 1034, 1036–37 (D.C. Cir. 2025); *Am. Great Lakes Ports Ass'n v. Schultz*, 962 F.3d 510, 518–19 (D.C. Cir. 2020).  This is especially appropriate here, where the alleged violations are procedural. *City of Port Isabel*, 130 F.4th at 1038 (explaining that the agency's "procedural missteps" did not justify upending ongoing construction projects).  But the important point for irreparable-harm purposes is that NPS could comply with a Court order to that effect.  This is unlike a situation where a plaintiff is trying to stop a tree from being cut down, a building from being demolished, or a species from going extinct.

suffered irreparable injury.  *See* Dkt. No. 2 at 19-20.  To be sure, for purposes of the irreparable injury analysis, a court "assumes, without deciding, that the movant has demonstrated a likelihood that the non-movant's conduct violates the law" and "examine[s] only whether that violation, if true, inflicts irremediable injury."  *Chaplaincy of Full Gospel Churches*, 454 F.3d at 303.  But unlike (as an example) a violation of constitutional rights, this is not a circumstance where a violation of law is a *per se* irreparable harm.  Something more is necessary.  Even if NPS violated NEPA or NHPA, "procedural injury accompanied by harm that is concrete but not 'great' (as is required for a preliminary injunction) does not equate to irreparable harm." *Alcresta Therapeutics, Inc. v. Azar*, 318 F. Supp. 3d 321, 327 (D.D.C. 2018) (collecting cases).

Assuming for the sake of argument that a full Section 106 consultation process were necessary (which it was not, *see* Section III.A, *infra*), Plaintiffs' participation rights as outlined in 36 C.F.R. §§ 800.3-800.6 are as follows:  Plaintiffs would have had the right to request consulting party status, and NPS would have been obliged to consider such a request.  *See* 36 C.F.R. § 800.2(c)(5) ("individuals and organizations with a demonstrated interest in the undertaking *may* participate as consulting parties"); 36 C.F.R. § 800.3(f)(3) ("agency official shall *consider* all written requests of individuals and organizations to participate as consulting parties") (emphasis added).  Whether to accord them consulting party status, however, is within NPS's discretion.  As members of the public, Plaintiffs would have had the opportunity to provide comments, *see* 36 C.F.R. § 800.2(d)(1)-(2), in response to which NPS would have no obligation to change course.  The gravamen of Plaintiffs' supposed injury is, at most, the lost opportunity to provide input.  This is insubstantial.  *See Chaplaincy of Full Gospel Churches*, 454 F.3d at 297–98 (citation omitted); *Summers,* 555 U.S. at 496 (2009)

21

For NEPA purposes, Plaintiffs' argument is even weaker.  Under the Department of the Interior's current NEPA guidance, unless NPS determined that the proposed action was likely to have a significant impact on the environment such that it needed to prepare an environmental impact statement, it had no obligation to engage in public comment.  *See National Environmental Policy Act Implementing Regulations*, 91 Fed. Reg. 8738, 8751 (Feb. 24, 2026) ("NEPA, as amended by the Fiscal Responsibility Act of 2023, requires agencies to take public comment in only one specific circumstance: when agencies issue a notice of intent to prepare an environmental impact statement . . . . In developing its regulations and NEPA Handbook, DOI elected not to create new and additional public participation requirements that are not grounded in applicable law[.]").

Plaintiffs give absolutely no reason to think that this project would have the scale and degree of impact that would require an environmental impact statement.  Indeed, the prior, more extensive renovation of the Reflecting Pool in 2012 (which involved, *inter alia*, the destruction of the original pool floor and a change in water supply system) only merited an environmental assessment.  *See* Ex. C at iii.  At a minimum, Plaintiffs haven't made a "clear showing" that they lost any procedural right.  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008).  And even if they had, such a bare procedural violation falls short of the high standard for a "certain and great" injury necessary for emergency relief.  *See Chaplaincy of Full Gospel Churches*, 454 F.3d at 297 (citation omitted); *see also Zayas v. Aviles-Ramos*, 2025 WL 3442925, at *2

22

(S.D.N.Y. Dec. 1, 2025).[8]  Plaintiffs are asserting  "procedural right[s] *in vacuo*" that do not even suffice for standing, *Summers,* 555 U.S. at 496 (2009), much less for emergency relief.

Third, Plaintiffs' supposed informational injury has already been resolved, and this claim is moot.  Plaintiffs offer no reason to think that, as a consequence of the NHPA or NEPA processes, they would be entitled to any information apart from the information in the Assessment of Effects and Categorical Exclusion documentation set forth at Exhibits F and G, to which they now have access.  This injury is also arguably hypothetical: the information-sharing provisions in 36 C.F.R. § 800.6(a)(3)[9] only apply if there is a determination that the undertaking will have adverse effects, and here, NPS found to the contrary.  In sum, there is no informational injury here because Plaintiffs have all the information that NPS would be obligated to disclose.  If Plaintiffs' argument is that they are entitled to more information—like information generated during an environmental assessment or impact statement—that simply rehashes their (incorrect) merits argument.

The cases Plaintiffs cite on this front are therefore distinguishable.  In those cases, the plaintiffs were litigating time-sensitive Freedom of Information Act requests, and they did not

---

[8] Nor is it clear that Plaintiffs' alleged procedural harms would be irreversible.  If the Court remanded this decision for further NHPA or NEPA review, Plaintiffs could offer their input at that time.  On remand, NPS could, hypothetically, change its mind about the project in response to that input, and, as explained above, take action to change the color of the Reflecting Pool's liner.  Of course, Defendants disagree that NPS violated either statute.  But the fact that Plaintiffs could still have their procedural rights renewed in the ordinary course of litigation cuts against a finding of irreparable harm.

[9] Plaintiffs' Complaint alleges a violation of "Section 106," *i.e.*, 54 U.S.C. § 306108, a provision of law that does not itself set forth any disclosure obligations.  Dkt. No. 1 at 20; *see also Friends of Animals v. Jewell*, 828 F.3d 989, 992 (D.C. Cir. 2016) ("A plaintiff suffers sufficiently concrete and particularized informational injury where the plaintiff alleges that: (1) it has been deprived of information that, on its interpretation, a statute requires the government or a third party to disclose to it, and (2) it suffers, by being denied access to that information, the type of harm Congress sought to prevent by requiring disclosure.").

have the documents they sought.  *See Brennan Ctr. for Just. at NYU Sch. of L. v. Dep't of Com.*, 498 F. Supp. 3d 87, 101 (D.D.C. 2020) (noting that the plaintiff would be harmed if it did not have "the records it seeks" prior to the end of the census and apportionment process); *see also Protect Democracy Project, Inc. v. U.S. Dep't of Just.*, 498 F. Supp. 3d 132, 141–42 (D.D.C. 2020) (similar); *Ctr. for Pub. Integrity v. U.S. Dep't of Def.*, 411 F. Supp. 3d 5, 12–13 (D.D.C. 2019) (similar).  Here, unlike a Freedom of Information Act request, where Defendants have a legal obligation to provide information, Plaintiffs have all of the documents to which they are entitled and have not identified additional information that exists.  In sum, Plaintiffs fall far short of the high irreparable injury standard required by the D.C. Circuit.  The Court should deny their Motion for that reason alone.

## III.    Plaintiffs are not likely to succeed on the merits

Plaintiffs' failure to establish standing also illustrates that they are unlikely to succeed on the merits; Defendants incorporate those arguments by reference under this heading.  And even to the extent they have standing, Plaintiffs fare poorly on the merits of their NHPA and NEPA claims.

### A.    Defendants complied with the NHPA

Plaintiffs say that Defendants failed to comply with the NHPA.  Dkt. No. 2 at 12–15. Not so.  NPS properly and reasonably documented its determination that this maintenance project qualified for the streamlined review process in NPS's Programmatic Agreement.

Section 106 of the NHPA is procedural, and claims brought under Section 106 are analyzed under the APA's arbitrary-and-capricious standard.  *See Oglala Sioux Tribe v. U.S. Nuclear Regul. Comm'n*, 45 F.4th 291, 298–99 (D.C. Cir. 2022).  Under that deferential

24

standard, an agency's determinations under Section 106 will be upheld "so long as the agency's decision is 'reasoned and rational.'" *Id.* at 299 (citation omitted).

Section 106 of the NHPA and its implementing regulations authorize the use of a programmatic agreement in certain circumstances, including "[w]here routine management activities are undertaken at Federal installations, facilities, or other land-management units." *Id*. § 800.14(b)(iv).

NPS relied on a programmatic agreement (the "Agreement") here.  In 2008, NPS entered into the Agreement with the Council and the National Conference of State Historic Preservation Officers, consistent with 36 C.F.R. § 800.14(b).  *See* Ex. H at 1; 36 C.F.R. § 800.2(c).  The Agreement noted that "NPS park operations, management, and administration require a large number of low-impact or repetitive activities on a daily basis that have the potential to affect properties" of cultural or historical significance and sought to "provide[] an efficient process for compliance with Section 106 for daily NPS park operations, management, and administration activities." Ex. H at 2.  The Agreement set forth a "streamlined" review process for projects with no adverse effect on historic properties.  Ex. H at 9-10.  When the criteria for a "streamlined" review process apply, "no further consultation is required" unless specifically requested by a State Historic Preservation Officer ("SHPO") or the Council.  Ex. H at 10-11.

To be eligible for streamlined review, a proposed undertaking must generally satisfy three requirements.  First, it must be an activity eligible for streamlined review.  Ex. H at 9.  For instance, NPS can use the streamlined process for "routine repairs," including but not limited to projects like "[c]leaning and stabilizing" historic structures or "[r]epainting in the same color, or in similar colors or historic colors." *Id*. at 12.  Second, all historic properties within the undertaking's area of potential effects must have been previously identified and evaluated for

25

eligibility for listing in the National Register of Historic Places. *Id*. at 9–10. And third, the agency Section 106 Coordinator must have reviewed the undertaking and certified that its effects on historic properties or properties eligible for the National Register will not be adverse. *Id*. at 10.

NPS applied those procedures here in a reasonable fashion. First, NPS determined that this activity was eligible for a streamlined review because it entailed the preservation, maintenance, and repair of a historic property. Ex. G at 3. Notably, the entire pool basin has been rebuilt multiple times, and the undertaking would not affect the only visible historic fabric of the original structure, i.e., the granite stones that line the pool's edge. NPS Decl. at ¶¶ 8-11, 26. NPS explained in its Assessment of Effects that the undertaking was "consistent with the historic character and design intent of the site, as the pool has historically relied on dark-colored materials to enhance its reflective quality and visual depth," and "would constitute a minimal and reversible intervention that supports the continued preservation and public appreciation of the property['s] National Register qualities." Ex. G at 3. Second, NPS determined that all other historic properties within the activity's area of potential effects have been identified and evaluated for eligibility on the National Register of Historic Places. *Id*. And third, the NPS Section 106 Coordinator concluded that the undertaking would have no adverse effect, a finding that the Superintendent then confirmed. NPS Decl. at ¶ 31; Ex. G at 3. NPS thus satisfied all criteria for a streamlined review.

Plaintiffs argue that the Agreement could not have applied to this undertaking, that NPS should have conducted a full Section 106 consultation, and that the use of streamlined procedures was arbitrary and capricious. Dkt. No. 2 at 14–15. Plaintiffs' argument misstates material facts. Plaintiffs insist that the Agreement could not have applied because, they assert,

NPS intended to paint the pool basin "[v]ivid blue," which is "not the same or similar to the existing grey, achromatic color." *Id*. at 15. Not so. *See* Ex. J at 1, 5; NPS Decl. at ¶¶ 21–22. NPS correctly—and, at a minimum, reasonably—concluded that this project would not change the pool's dark color in any material way. *See* Ex. G at 4 (concluding that "a tinted epoxy coating to the Reflecting Pool is consistent with the historic character and design intent of the site, as the pool has historically relied on dark-colored materials to enhance its reflective quality and visual depth"); *id.* ("The use of a tinted epoxy would be a sympathetic treatment, as it maintains the essential visual function and appearance, which are key aspects of its significance and integrity as a contributing feature to the Lincoln Memorial Grounds and West Potomac Park Historic Districts."). NPS made this finding only after consulting with a historic landscape architect from the National Capital Regional office, who recommended that NPS retain a dark color for the reflecting pool surface. NPS Decl. at ¶ 21. NPS therefore reasonably concluded that this undertaking fell into the category of preservation, maintenance, and repair of historic properties. Ex. H at 11–12.

To be sure, a different decisionmaker might conclude that any change to the epoxy color falls outside the Agreement. For example, a stray paragraph in the NHPA review expresses such a view.[10] But the agency official responsible for the decision ultimately concluded that streamlined review was appropriate because the undertaking would bring no adverse effects to historic properties, as it was compatible with historical design precedent and did not amount to a comprehensive rehabilitation of the Reflecting Pool. Taking the circumstances of the

---

[10] That paragraph noted that "[n]o Streamlined Activity" clearly aligned with the undertaking, that the DC SHPO might not concur, and that time pressure from leadership made Streamlined Review a compelling choice. Ex. G at 4. NPS inadvertently retained this deliberative paragraph from an earlier draft. Ex. G at 4; NPS Decl. at ¶ 31.

undertaking into account, this was a reasonable conclusion, especially since the Agreement expressly contemplates a process for "routine repairs" (like repairing leaks) and other activities that involve using a new color that's "similar" to the existing one. *See* Ex. H at 12. Review under NHPA simply requires a reasoned and rational decision. *Oglala Sioux Tribe*, 45 F.4th at 299. Plaintiffs have offered no real basis to second-guess NPS's considered judgment, and they are thus unlikely to succeed on their NHPA claims.[11]

Even assuming that, for the sake of argument, NPS erred by engaging in a streamlined review process under the Agreement, Plaintiffs have not shown that NPS would have likely reached a different conclusion: the determination that a dark blue pool bottom would have no adverse effect on the historic character of the Reflecting Pool was well-reasoned. So even if there were a procedural violation, the "prejudicial error" or "administrative law harmless error rule" means Plaintiffs' claims still fail. *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 591 U.S. 657, 684 (2020).

### B.      Defendants complied with NEPA

CLF fails to allege any injury arising from the purported NEPA violation, and Mr. Birnbaum's purported aesthetic harms are based on demonstrably false assertions of fact. Dkt. No. 2 at 8–11. They therefore lack standing, and the Court therefore lacks jurisdiction. *See* Section I, *supra*. But assuming for the sake of argument that the Court can reach these claims, they are without merit.

---

[11] The DC SHPO, as noted above, contacted NPS regarding this undertaking on April 28, 2026. Ex. I at 1. To the extent that NPS and DC SHPO do not reach agreement and the parties engage in dispute resolution, the Agreement sets forth procedures for doing so. Ex. H at 24–25. Plaintiffs are not signatories to the Agreement and offer no reason to think they would have a legal basis to enforce its terms. *See Coal. of 9/11 Fams., Inc. v. Rampe*, 2005 WL 323747, at *2 (S.D.N.Y. Feb. 8, 2005) (Rakoff, J.).

28

If an agency determines that action meets the criteria for a categorical exclusion, NPS need not prepare an environmental assessment or environmental impact statement. 43 C.F.R. § 46.205(a), (f). Among the activities that NPS has identified as eligible for a categorical exclusion are "[r]outine maintenance and repairs to cultural resource sites, structures, utilities and grounds . . . if the action would not adversely affect the cultural resource."[12] To apply a categorical exclusion, the agency must conclude that no "extraordinary circumstances," set forth in 43 C.F.R. § 46.215, apply to the action at issue.

Here, NPS followed its regulations and guidance to the letter. NPS determined that this action involved routine maintenance and would not have a significant effect on the cultural resource. Ex. F at 2. And NPS further determined that this action did not implicate any extraordinary circumstances, among other things, because it would not have a significant impact on the Reflecting Pool. *Id*. On that point, NPS explained that "[t]he action consists of repair and waterproofing of the existing pool, with temporary fencing and staging during construction, and would not expand the pool footprint, remove granite coping stones, or add permanent new structures." *Id*. The Supreme Court has recently explained that "the question of whether a particular report is detailed enough in a particular case itself requires the exercise of agency discretion—which should not be excessively second-guessed by a court." *Seven County*, 605 U.S. at 181. That instruction applies squarely here.

Plaintiffs offer little argument on this score. Plaintiffs note that, in 2010, NPS released an environmental assessment for a different Reflecting Pool project. Dkt. No. 2 at 16. But just because a different project "involves the same resource" does not mean that the "same process

---

[12] U.S. Dep't of Interior, <u>DOI NEPA Handbook</u>, Appendix 2, 12.5, C(4) at 87 (2026), available at https://www.doi.gov/media/document/doi-handbook-nepa-procedures.

should be followed." *Contra id.* Even a cursory glance at the prior project reveals that it involved more significant changes than here, including changing the Reflecting Pool's water source, formalizing walkways, and installing a "permanent vehicular security system to replace the temporary concrete barriers." Ex. C at iii; Ex. A at 195–96. Here, although the challenged project involved a meaningful maintenance and rehabilitation effort, NPS envisioned a minor, perhaps imperceptible, change to the visual landscape and historical character of the site. Plaintiffs also suggest, without citation or further explanation, that the "environmental concerns here are not trivial" because the project "involves applying paint to an enormous water feature." Dkt. No. 2 at 16–17. Again, this misstates the facts. NPS is not painting anything. What Plaintiffs characterize as a vanity project is actually a badly needed maintenance project designed to address leakage issues and prolong the life of the pool's deteriorating concrete basin. Plaintiffs do not explain why the decision to address a longstanding maintenance issue with a commercially available waterproofing system would have the potential unnamed ecological consequences they seem to fear. Plaintiffs' NEPA claims are meritless and present little chance of success.

And just like for the NHPA claims, Plaintiffs offer no reason to think that NPS would have reached a different conclusion given a more robust NEPA review process: such a minor alteration to the human environment would be unlikely to produce any impact, much less a significant one. Thus the harmless error rule forecloses Plaintiffs' claims. *Little Sisters of the Poor*, 591 U.S. at 684.

### III.    The balance of equities and public interest weigh against injunctive relief

Because Plaintiffs have not shown imminent irreparable harm or a likelihood of success on the merits, the Court need not address the final two *Winter* factors.  Even so, the balance of equities and public interest tip decisively in Defendants' favor.  In assessing these factors, courts "balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief."  *Winter*, 555 U.S. at 24 (citation omitted).  Where a "movant seeks to enjoin the government, the final two factors merge 'because the government's interest is the public interest.'"  *N. Am.'s Bldg. Trades Unions v. Dep't of Def.*, 783 F. Supp. 3d 290, 314 (D.D.C. 2025) (quoting *Pursuing Am.'s Greatness v. Fed. Election Comm'n*, 831 F.3d 500, 511 (D.C. Cir. 2016)).

Here, Plaintiffs request that the Court order the work on the Reflecting Pool to come to a halt.  Dkt. No. 2 at 34 ([Proposed] TRO).   Plaintiffs' standing and irreparable harm arguments are based in part on the importance to Mr. Birnbaum of his monthly visits to the Reflecting Pool. *See* Dkt. No. 2 at 10–11, 18–19.  An injunction during the pendency of this litigation would disrupt many such visits.  To the extent that Plaintiffs have a genuine interest in the appearance of the Reflecting Pool and believe that the resurfacing process presents a "concrete[] and continuous[] harm[]" to that interest, Dkt. No. 2-1 at 9, their requested relief would— perversely—prolong their injury and do them more harm than good.

Conversely, the government and the public have a compelling interest in the Court withholding the requested relief.  Plaintiffs' requested emergency relief would require that the Reflecting Pool be empty, dry, and half-finished through the upcoming celebrations of the 250th anniversary of the Declaration of Independence—a significant aesthetic harm to the public.  NPS Decl. at ¶ 47.  Plaintiffs' requested relief would also increase project costs by approximately

31

$23,000 per day, and more if the contractor is forced to demobilize the operation.  NPS Decl. at

¶ 46.  Lastly, an injunction against NPS would harm the government because the public interest

favors limiting federal courts to the jurisdiction and remedies provided by Congress as a matter

of separation of powers.  *Trump v. CASA, Inc.*, 606 U.S. 831, 861 (2025).

Plaintiffs' requested relief reduces to the following:  if they can't be involved in the

process and ensure the Reflecting Pool looks just the way they want, nobody should be able to

enjoy it.  The balance of equities and public interest tip decisively in Defendants' favor.

**IV.     Plaintiffs should be required to post bond if the Court grants injunctive relief**

Before a court may award preliminary injunctive relief, a plaintiff must post a

compensatory security bond. Fed. R. Civ. P. 65(c).  If the Court were to grant an injunction here,

Defendants would incur approximately $23,000 per day in costs, and it would cost $1.8 million

to fully demobilize.  NPS Decl. at ¶ 46.  Assuming that the injunction would make it

economically irrational to pause the project, demobilization would be Defendants' only feasible

option.  Defendants therefore request a compensatory security bond in the amount of $1.8

million in the event the Court grants a preliminary injunction.

Contrary to Plaintiffs' arguments, Defendants have indeed shown tangible financial

harms that would arise from injunctive relief.  In contrast, the financial burden Plaintiffs profess

to face is supported by nothing apart from generic statements about their nonprofit status.

Irrespective of whether Plaintiffs believe their motion will further the public interest—and there

is good reason to think that it wouldn't—the text of Rule 65(c) says what it says, and if the Court

is inclined to grant a preliminary injunction, it should require Plaintiffs to post a bond.

**CONCLUSION**

In their rush to litigate against a project they do not like, Plaintiffs filed a Motion that has a weak grasp of the facts.  Plaintiffs misrepresent the color of the pool's bottom; NPS's design decision will achieve reflectivity, raising significant questions as to Plaintiffs' claims of standing. The pool's ultimate color will be reversible, which dooms Plaintiffs' claim of irreparable injury. Far from "[doing] neither" a NHPA or NEPA review, Dkt. No. 2 at 1, Defendants completed both procedural steps, which means Plaintiffs have no likelihood of success on the merits.  Nor did Plaintiffs think much about their requested relief: a dark-blue-bottomed Reflecting Pool is aesthetically preferable to one that is dry and empty.  The Court should deny Plaintiffs' Motion.


Dated: May 18, 2026                    Respectfully submitted,

                                       ADAM R.F. GUSTAFSON
                                       Principal Deputy Assistant Attorney General

                                       BRADLEY CRAIGMYLE
                                       Deputy Assistant Attorney General

                                       */s/ John K. Heise*
                                       JOHN K. HEISE (CA Bar No. 331615)
                                       Trial Attorney
                                       Natural Resources Section
                                       Environment & Natural Resources Division
                                       Natural Resources Section
                                       Ben Franklin Station, P.O. Box 7611
                                       Washington, D.C. 20044-7611
                                       Telephone: (202) 598-3312
                                       Email: john.heise@usdoj.gov

                                       *Attorneys for Defendants*

33