**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| THE CULTURAL LANDSCAPE FOUNDATION et al.,<br><br>*Plaintiffs*,<br><br>   *v.*<br><br>U.S. DEPARTMENT OF THE INTERIOR et al.,<br><br>*Defendants*. | No. 26 Civ. 1593 |

**DECLARATION OF DR. KEVIN GRIESS, SUPERINTENDENT OF NATIONAL MALL
AND MEMORIAL PARKS**

I, Kevin Griess, declare as follows:

1.  I am the Superintendent of National Mall and Memorial Parks (NAMA) and have been in that position since November 2024. Prior to that time, I was employed by the U.S. Army as the Deputy Garrison Commander at Fort Bragg in North Carolina.  In that role, I was a military City Manager, responsible for all municipal operations for a military city of 135,000.  In my current position, I report to the Regional Director of the National Capital Region, Jennifer Nersesian.

2.  I have personal knowledge of all facts stated in this declaration, and if called to testify, I could and would testify competently thereto.

3.  As Superintendent of NAMA, I manage and oversee a highly experienced and technically qualified staff to ensure the preservation, protection, and daily operations of more than 1,000 acres of federal parkland in Washington, D.C., including the National Mall and the iconic monuments and memorials located throughout West Potomac Park. The Lincoln Memorial Reflecting Pool (Reflecting Pool) is within West Potomac Park. My

1

responsibilities include the stewardship, maintenance, and interpretation of the park's historic structures, statues, monuments, commemorative works, and other nationally significant cultural resources. In this role, I oversee one of the largest and most complex maintenance programs within the NPS and am responsible for assets with a replacement value of approximately $8.4 billion. NAMA's portfolio includes 47 miles of roadways, 52 miles of sidewalks, three national icons, and more than 80 memorials and commemorative works. I direct all aspects of facility maintenance, repair, rehabilitation, and operational management across the park. My duties also include the development and execution of master plans, resource protection strategies, and long-term planning documents and insuring compliance with applicable laws and regulations, including the National Environmental Policy Act (NEPA), the National Historic Preservation Act (NHPA), and all relevant civic engagement and public involvement requirements.

**The History of the Reflecting Pool within West Potomac Park**

4. Most of West Potomac Park was created in the late 1800s by filling submerged or marshy areas of the Potomac River, including using material dredged from the bottom of the river.

5. As documented in a 2022 NPS Cultural Landscape Inventory for the Lincoln Memorial (2022 CLI) and a 2023 NPS Cultural Landscape Inventory for West Potomac Park (2023 CLI), the Reflecting Pool Reflecting Pool was originally constructed by the Office of Public Buildings and Grounds, which then had jurisdiction over federal parkland in the District of Columbia, after the construction of the Lincoln Memorial and dedicated in 1922. 2022 CLI at 57 and 2023 CLI at 109. True copies of the 2022 CLI and 2023 CLI are attached as Exhibits A and B, respectively.

6. The Reflecting Pool provides a long, axial formal water element connecting the Washington Monument and the Lincoln Memorial. It is one of the singularly important features of the McMillan Plan's intent to create grand axial extended vistas.

7. The Lincoln Memorial and its associated grounds, including the Reflecting Pool, are included within the boundaries of the East and West Potomac Parks Historic District, which was listed in the National Register of Historic Places (National Register) in 1973, and updated in 2001, and the National Mall Historic District, listed in the National Register in 1966, and updated in 2016. 2022 CLI at 30-31. The Reflecting Pool is identified as a contributing site to both historic districts. *Id.* at 31-32. The Reflecting Pool is not individually listed in the National Register and the NPS has not evaluated its eligibility for such listing.

8. As explained in the 2022 CLI, as originally constructed, the Reflecting Pool had a water-proof base that consisted of an asphalt-coated membrane, dark slate and concrete tiles. 2022 CLI at 57, 132, 315. The tile was selected because it "was dark in color and augmented the reflective properties of the completed pool" and gave a "sense of water depth." *Id.*

9. In December 2009, the NPS released an Environmental Assessment (2009 EA) for public comment, in which it evaluated two alternatives for the rehabilitation of the Reflecting Pool and surrounding areas. A true copy of the 2009 EA is attached as Exhibit C. In the 2009 EA, the NPS explained that action was needed to "address substantial repairs and structural deficiencies at the Reflecting Pool." 2009 EA at 1-2. The NPS explained that "differential soil settlement" had compromised the Pool's structural system and that the "stress on the foundation, joints, and coping [had] caused pervasive water leakage…" *Id.*

10. In 2010, the NPS signed a Finding of No Significant Impact (FONSI) for the rehabilitation project. A true copy of the signed FONSI is attached as Exhibit D. As part of this project, which was completed in 2012, the entire Reflecting Pool was rebuilt due to significant water leakage, biological growth, and settling of its foundations. The NPS temporarily removed the granite coping stones (which were later reinstalled), while the original coping foundation and timber piles were left in place to preserve the historic fabric of the coping stones and underlying support system. Within the pool basin, the original concrete slab was demolished, and approximately 2,500 timber piles were driven to bedrock, roughly 40 feet below grade, to support a new foundation system and an 8-inch-thick reinforced colored concrete pool slab. The work also included caulking and sealing the expansion joints and refurbishing and reinstalling the existing stone coping along the pool edge. In addition, the NPS installed a new water supply system that drew fresh water for the Reflecting Pool from the Tidal Basin (instead of from city water) and filtered it with ozone.

11. The 2012 rehabilitation reduced the overall volume and depth of the Reflecting Pool by sloping the edges into the middle, introducing changes from the original design. After the 2012 rehabilitation of the Reflecting Pool, the coping stones are the only visible historic fabric remaining from the original construction of the Reflecting Pool. All concrete was removed and repoured. The new concrete was dark tinted to enhance the reflection of the pool.

12. Following this rehabilitation project, numerous expansion joints in the pool failed much earlier than anticipated. In 2013, the NPS commissioned an investigation of the structural condition of the Reflecting Pool due to a water loss event in January 2013. A true copy of the final report resulting from this investigation (2013 Final Report) is attached as Exhibit

E. The investigation revealed that approximately 500,000 gallons of water had been lost from the Reflecting Pool in five days in January 2013. 2013 Final Report at 2. The investigation revealed that the most likely cause of the water loss was the failure in the expansion joint materials along the interior of the newly poured slab. *Id.* at 3. The investigation also found several, relatively minor cracks in the newly poured concrete slab. *Id.* at 2.

13. My staff estimates that over 25 million gallons of water per year have been lost due to leaks since the 2012 rehabilitation project. Since 2021, NPS has documented water usage at the Reflecting Pool by monitoring the water meter. Based on this information, and after accounting for cleaning and refilling operations that utilize approximately 7 million gallons of water and other known leaks, my staff estimates that the Reflecting Pool has lost 28.8 million gallons annually due to leaks since 2021.

14. In 2023, the NPS reviewed and approved a project to replace failed expansion joints as they were contributing to significant water loss and operational issues. During preparatory work for that project, additional deterioration was identified that required immediate attention. In addition to the failing expansion joints that the NPS was aware of, the concrete poured in 2012 had visible cracking and spalling (flaking or chipping of the surface concrete) which led to the exposure of the rebar reinforcing the structure and accelerated deterioration of the concrete surface. The NPS believes that the deteriorated concrete contributed to the leaks and associated water loss from the Reflecting Pool.

15. The NPS periodically drains and cleans the Reflecting Pool to improve water quality and enhance the reflective character of the pool's surface. At these times, the NPS removes

accumulated algae, accumulated sediments, and wildlife excrement from the pool. Below

are photographs from the December 2025 cleaning of the Reflecting Pool.







16. During this cleaning process, I held a discussion with my resource management team and maintenance leadership to address the massive leaking and water clarity issues with the Reflecting Pool, in preparation for a renovation project then-planned for 2026-2027. I tasked the team with exploring all possible solutions including oxygenation infrastructure, water additives, surface painting and sealing, and any other possible solutions. At that time, my team found no solutions to these issues that had not already been explored and ruled out due to cost or lack of long-term effectiveness.

**The 2026 Project**

17. On March 28, 2025, the President of the United States issued Executive Order 14252 Making the District Columbia Safe and Beautiful. Among other things, Executive Order 14252 requires the Secretary of the Interior to develop and implement a program to beautify and make the District of the Columbia safe and prosperous. Executive Order 14252 is available online at https://www.presidency.ucsb.edu/documents/executive-order-14252-making-the-district-columbia-safe-and-beautiful.

7

18. On April 4, 2025, the Secretary of the Interior issued Secretarial Order 3428, Making the District of Columbia Safe and Beautiful, implementing Executive Order 14252, which requires the Assistant Secretary for Fish Wildlife and Parks to develop and implement a program to beautify and make the District of Columbia safe that includes "a coordinated beautification plan for Federal and local facilities, monuments, lands, parks, and roadways in and around the District of Columbia." Secretary's Order 3428 is available online at https://www.doi.gov/document-library/secretary-order/so-3428-making-district-columbia-safe-and-beautiful.

19. Consistent with Executive Order 14252 and Secretary's Order 3428, the NPS has undertaken restoration and beautification activities on NPS-managed lands in D.C., including lands within the National Mall and Memorial Parks, consistent with applicable laws and after completing appropriate environmental compliance documentation.

20. As part of this effort, the NPS identified a project to address known leaks in the Reflecting Pool, as well as the deterioration of its concrete surface, and improve its water quality as directly supporting Executive Order 14252 and Secretary's Order 3428. During the planning for this project, the administration presented an option to address the Reflective Pool's massive leaking and water clarity issues that my team had not previously considered—the installation of a durable polyurea liner over an epoxy primer.

21. My team formulated a project that would replace the damaged and leaking expansion joints and coating the concrete surface of the Reflecting Pool with a dark colored, durable polyurea liner over an epoxy primer. The polyurea liner was identified as a cost-effective means of stopping or reducing the leaks from the failing expansion joints and through the concrete itself, and of inhibiting algae growth inside the pool. It would remediate the

8

deterioration of the concrete and preserve its utility while at the same time preserving the Reflecting Pool's historic character because it would preserve and enhance its reflective function without impacting extant historic materials (the granite coping stones lining the pool).

22. American Flag Blue, a dark and muted, low chroma, color was selected for the liner. The image below is a color sample of American Flag Blue provided to the NPS:



23. The image below is a photograph of a physical sample of the final product as it will appear when applied to the Reflecting Pool. The physical sample was poured on site as a test and provided to the NPS by its contractor.



24. On March 31, 2026, I signed a categorical exclusion (CE) documentation form for the proposed project to install a tinted polyurea liner on the Lincoln Memorial Reflecting Pool

to waterproof and protect the concrete pool surface, to comply with NEPA. A true copy of the CE documentation form is attached as Exhibit F.

25. The CE documentation form explains that NPS applied a categorical exclusion for the project. Specifically, the NPS applied DOI NEPA Handbook, Appendix 2, 12.5, C(4), (Feb. 2026) for "[r]outine maintenance and repairs to cultural resource sites, structures, utilities and grounds…if the action would not adversely affect the cultural resource."

26. As documented in the CE documentation form, the NPS concluded that the proposed project was "consistent with the CE applied because "it consists of routine maintenance and repair to an existing cultural resource feature within its current footprint. The action would not expand, relocate, or replace the reflecting pool; would not remove the granite coping stones; and would not construct permanent new facilities. The purpose of the action is to preserve and protect the existing reflecting pool basin through maintenance and repair of deteriorated surfaces and joints and installation of a protective waterproof lining system."

27. The NPS also considered the extraordinary circumstances identified in the Department of the Interior's NEPA implementing regulations and documented its finding that none of these extraordinary circumstances existed in the CE documentation form. CE documentation form at 2-4.

28. Also on March 31, 2026, the NPS completed an "Assessment of Actions Having an Effect on Historic Properties" for the project, documenting compliance with Section 106 of the NHPA. A true copy of the assessment is attached as Exhibit G.

29. The assessment documented the NPS's consideration of the effects of the proposed project on historic properties and the NPS's finding, after consulting with a historic landscape

architect from the National Capital Regional Office who recommended that any planned work should retain the dark coloring of the Reflecting Pool surface, that the project would have "No Adverse Effect" on any historic properties. Assessment at 3. The NPS found that the project was eligible for streamlined review under the NPS's 2008 Nationwide Programmatic Agreement with the Advisory Council on Historic Preservation and the National Conference of State Historic Preservation Officers, because it met "all conditions for a streamlined review under section III of the 2008 [Nationwide Programmatic Agreement] for Section 106 compliance." A copy of the NPS's 2008 Nationwide Programmatic Agreement is attached as Exhibit H. The parties to the 2008 Nationwide Programmatic Agreement are the NPS, the National Conference of State Historic Preservation Officers (NC SHPO) and the Advisory Council on Historic Preservation (ACHP).

30. Where the NPS finds that a project is eligible for streamlined review under the Nationwide Programmatic Agreement, "no further consultation is required unless otherwise specifically requested by the SHPO/THPO, Federally recognized Indian Tribe(s) or Native Hawaiian organization(s), or the [Advisory Council on Historic Preservation]." Exhibit H at p. 9. In such instances, the NPS simply includes the project on an annual report to the applicable State Historic Preservation Officer, here the District of Columbia Historic Preservation Office (DC HPO).

31. Unfortunately, the signed assessment inadvertently included an internal deliberative note questioning whether the project qualified for streamlined review under the NPS's 2008 Nationwide Programmatic Agreement. By signing the assessment, my Section 106 coordinator recommended to me that the project qualified for Streamlined Review. And

11

when I signed the Assessment, I determined that the project qualified for streamlined review under the Nationwide Programmatic Agreement based on that recommendation.

32. On April 28, 2026, I received a letter from the DC HPO notifying me that the HPO believed that further consultation regarding the project with the HPO was required pursuant to Section III of the Agreement. The HPO also requested that NPS provide information so that he could better understand how the NPS interpreted the Programmatic Agreement. Importantly, the HPO's letter made clear that the HPO believed that the Reflecting Pool would be repainted "bright blue" and that such repainting would be an adverse effect to the Reflecting Pool. A true copy of the HPO's April 28, 2006 letter is attached to this declaration as Exhibit I.

33. On April 29, 2026, the NPS responded to the HPO via letter from the Regional Director of the NPS's National Capital Region, Jennifer Nersesian. A true copy of Ms. Nersesian's April 29, 2026 letter to the HPO is attached to this declaration as Exhibit J.

34. In her April 29 letter, Ms. Nersesian explained that the "bright blue" color referenced by the HPO was the color of the epoxy primer material, and that the final coating would be "a very dark blue, sympathetic with historic coatings and surface finishes on the Reflecting Pool." The images that had been publicly circulating at the time depicted the primer coating, not the final treatment for the Reflecting Pool. For example, the below image, included in the Plaintiff's Complaint in the captioned matter, depicts the epoxy primer coating, not the intended final coating of the tinted polyurea liner.

12



35. Ms. Nersesian further clarified that the final coating will be "dark and low chroma, a finish intentionally selected to maintain the Reflecting Pool's defining characteristic, its mirrorlike surface, and avoid any appearance inconsistent with its historic setting or its function as a formal commemorative landscape."

36. Also on April 29, 2026, the NPS sent a letter to the ACHP, forwarding the documentation provided to the DC HPO and explaining that while the NPS will engage with the HPO to resolve all expressed concerns, "since the project is ongoing and a disruption at this juncture could impact the adhesion of the coating," the NPS was requesting that ACHP "perform an expedited and concurrent review of the relevant documentation…" A true copy of the April 26, 2026 letter to the ACHP is attached as Exhibit K.

37. On May 4, 2026, the Executive Director of the ACHP, Reid Nelson, replied to the NPS's April 29 2026 letter. A true copy of this letter is attached as Exhibit L. In sum, the ACHP recommended that the NPS coordinate a meeting with the HPO to clarify the path forward

"[g]iven the significance of the historic property, as well as the need to continue with the project in a timely manner due to technical reasons."

38. Consistent with the ACHP's recommendation, the NPS conducted a consultation meeting with the HPO, ACHP and NC SHPO on May 13, 2026, regarding the HPO's concerns. Consultation with the HPO, ACHP and NC SHPO regarding the HPO's concerns is ongoing.

**Current Status of the Project**

39. On April 6, 2026, the NPS's contractor mobilized on site and began fencing the project site. This fencing will remain in place until the project is completed.

40. The next phase of the project included removal of the Reflecting Pool's existing expansion joints, sidewalk expansion joints and stone coping joints. This phase of the project was completed on April 17th.

41. On April 13th, the contractor began bead blasting of the concrete pool surface to clean the surface so that the epoxy coating could be applied. This work is ongoing and is being done in phases as the work progresses to different areas of the Reflecting Pool.

42. Application of the Rhino Epoxy Primer began on April 24th. This product is hand applied with squeegees and needs time to cure before the American Flag Blue Rhino Pipeliner 5000 is applied over it. The application of primer is ongoing as areas of the Reflecting Pool are prepped for its application. This material is depicted in the photograph in Paragraph 34 above.

43. The next step in the process is for the contractor to apply the American Flag Blue Rhino Pipeliner 5000 at approximately 100-200 millimeters thick across the surface of the Reflecting Pool. Once the primer is applied the American Flag Blue Rhino Pipeliner 5000

14

must be applied within 24 hours to properly adhere to the primer.  Its application is ongoing as areas of the Reflecting Pool are prepared for its application. When this process is complete, a textured coat will be applied to create a uniform surface.

44. Once the epoxy application is tested and inspected, and any imperfections found are remedied, the expansion joints of the Reflecting Pool will be filled with a flexible Rhino material that will then be coated with Rhino Epoxy Primer, American Flag Blue Rhino Pipeliner 5,000, and the textured coat to blend in with the surface of the Reflecting Pool. After this is completed, the sidewalk and coping stone joints will be filled.

45. After completion of the project, the Reflecting Pool will be refilled with water. The project will enhance the reflective quality of the water such that park visitors will likely be unable to see the epoxy liner, which will be below the water line.

46. The NPS estimates that if the project were to be paused at its current status, it would incur additional costs at the rate of approximately $23,000 a day. If the contractor were required to demobilize and restart the project, this would increase the cost of the project by around $1.8 million.

47. And, pausing the ongoing work without completing the project, would mean that the Reflecting Pool would remain closed indefinitely, until the pause is lifted and the project completed. The Reflecting Pool cannot retain water in its current state as the existing expansion joints have already been removed. This means that the Reflecting Pool cannot be filled with water until the project is completed.

48. It is my understanding that a new coating could be applied over the completed project that would change the color of the concrete surface from American Flag Blue to another color. This could be done by applying a new coat of epoxy primer and tinted polyurea coating. It

could also be accomplished by applying tinted polyurethane directly to the completed treatment.

Pursuant to 28 U.S.C. § 1746, I hereby certify under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed on May 18, 2026.

Date: 2026.05.18
15:46:55 -04'00'

Kevin Griess, PhD

16