**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

THE CULTURAL LANDSCAPE FOUNDATION et al.,

*Plaintiffs*,

v.

U.S. DEPARTMENT OF THE INTERIOR et al.,

*Defendants*.

No. 26 Civ. 1593

**<u>REPLY MEMORANDUM IN FURTHER SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER, SECTION 705 STAY, AND PRELIMINARY INJUNCTION</u>**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................... iii

INTRODUCTION ............................................................................................................... 1

ARGUMENT ...................................................................................................................... 2

I.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS .................................... 2

    A.  Defendants Brazenly Violated the NHPA ............................................................. 3

        1.  The 2008 Programmatic Agreement ............................................................. 3

        2.  The Resurfacing of the Reflecting Pool is Not Eligible for Streamlined Review, As Defendants' Decisional Document Admits ............................... 4

        3.  Defendants' Failure to Provide Notice is an Independent Violation of the NHPA ...................................................................................................... 11

        4.  There is no "harmless error" ....................................................................... 11

    B.  Defendants Violated NEPA .................................................................................. 12

II.   PLAINTIFFS HAVE STANDING AND WILL SUFFER IRREPARABLE HARM ABSENT RELIEF ................................................................................................... 15

III.  THE BALANCE OF EQUITIES AND PUBLIC INTEREST FAVORS PLAINTIFFS . 20

IV.  THE COURT SHOULD WAIVE ANY BOND REQUIREMENT ............................... 21

CONCLUSION .................................................................................................................. 23

**TABLE OF AUTHORITIES**

**Cases**

*Animal Legal Def. Fund, Inc. v. Glickman*, 154 F.3d 426 (D.C. Cir. 1998) (en banc) ................ 14

*City of Port Isabel v. FERC*, 111 F.4th 1198 (D.C. Cir. 2024) .................................................... 11

*Com. of Mass. v. Watt*, 716 F.2d 946 (1st Cir. 1983) .................................................... 18

*D&F Afonso Realty Trust v. Garvey*, 216 F.3d 1191 (D.C. Cir. 2000) .......................................... 4

*Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1 (2020) ...................... 13

*Escobar Molina v. U.S. Dep't of Homeland Sec.*, 811 F. Supp. 3d 1 (D.D.C. 2025) .................. 20

*Food & Drug Admin. v. Wages & White Lion Invs., L.L.C.*, 604 U.S. 542 (2025) ...................... 10

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167 (2000) ................. 14

*Info. Handling Servs., Inc. v. Def. Automated Printing Servs.*, 338 F.3d 1024 (D.C. Cir. 2003) ........................................................................................................................... 19

*Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992) ........................................................................ 14

*Marin Audubon Soc'y v. Fed. Aviation Admin.*, 121 F.4th 902 (D.C. Cir. 2024) ........................ 11

*Marsh v. Oregon Nat. Res. Council*, 490 U.S. 360 (1989) .......................................................... 18

*Mozilla Corp. v. FCC*, 940 F.3d 1 (D.C. Cir. 2019) ...................................................................... 9

*N. Am.'s Bldg. Trades Unions v. Dep't of Def.*, 783 F. Supp. 3d 290 (D.D.C. 2025) ............ 20, 21

*Narragansett Indian Tribal Historic Pres. Off. v. FERC*, 949 F.3d 8 (D.C. Cir. 2020) ............. 19

*Nat. Res. Def. Council, Inc. v. Morton*, 337 F. Supp. 167 (D.D.C. 1971) .................................. 20

*Nat'l Tr. for Historic Pres. v. Nat'l Park Serv.*, No. 25 Civ. 4316 (RJL), 2026 WL 877779 (D.D.C. Mar. 31, 2026) ........................................................................................................ 16, 17

*Nat'l Trust for Hist. Pres. in U.S. v. Dole*, 828 F.2d 776 (D.C. Cir. 1987) ................................ 12

*Open Top Sightseeing USA v. Mr. Sightseeing, LLC*, 48 F. Supp. 3d 87 (D.D.C. 2014) ............ 19

*Robertson v. Methow Valley Citizens Council*, 490 U.S. 332 (1989) ......................................... 11

*Root v. Ry. Co.*, 105 U.S. 189 (1881) ........................................................................................ 20

*San Luis Valley Ecosystem Council v. U.S. Fish & Wildlife Serv.*, 657 F. Supp. 2d 1233 (D. Colo. 2009) ............................................................................................................................................. 16

*Sierra Club v. EPA*, 793 F. Supp. 3d 158 (D.D.C. 2025) ............................................................ 19

*Sierra Club v. Morton*, 405 U.S. 727 (1972) .............................................................................. 14

*Spokeo, Inc. v. Robins*, 578 U.S. 330 (2016) .............................................................................. 17

*Sutton Invs. LLC v. Perlmutter*, No. 21 Civ. 3226 (CJN), 2021 WL 6062635 (D.D.C. Dec. 22, 2021) ............................................................................................................................................. 20

*Toledo Hosp. v. Becerra*, 621 F. Supp. 3d 13 (D.D.C. 2021) .................................................. 5, 6

*Wash. Area Bicyclist Ass'n, Inc. v. Burgum*, No. 26 Civ. 0988 (ABJ), 2026 WL 1078218 (D.D.C. Apr. 21, 2026) ............................................................................................................................... 12, 13

**Statutes**

42 U.S.C. § 4336(a)(2) ............................................................................................................. 11
42 U.S.C. § 4336e(1) ............................................................................................................... 11

**Regulations**

36 C.F.R. § 68.3(a)(5) ................................................................................................................ 6
36 C.F.R. §§ 68.3(a)(5)-(6), (b)(6) ...................................................................................... 7, 13
36 C.F.R. Part 800 .................................................................................................................. 3, 9
36 C.F.R. § 800.1(c) ................................................................................................................ 17
36 C.F.R. § 800.14(b) ............................................................................................................... 2
36 C.F.R. § 800.14(b)(1) ........................................................................................................... 6
36 C.F.R. § 800.14(b)(2)(iv) .................................................................................................... 10
36 C.F.R. § 800.2(d) ................................................................................................................ 17
36 C.F.R. § 800.2(d)(1)-(2) ................................................................................................... 3, 10
36 C.F.R. § 800.5(a)(2)(ii) ......................................................................................................... 9
43 C.F.R. § 46.205 ................................................................................................................... 11
43 C.F.R. § 46.205(a) .............................................................................................................. 12
43 C.F.R. § 46.205(c) .............................................................................................................. 13
43 C.F.R. § 46.205(h) .............................................................................................................. 11
43 C.F.R. § 46.210 ................................................................................................................... 12
43 C.F.R. § 46.210(f) ............................................................................................................... 12
43 C.F.R. § 46.215(f) ............................................................................................................... 13

**Other Authorities**

Suzanne Blake, *How Trump's Lincoln Memorial Repair Projects Compare to Predecessors'*, Newsweek (May 12, 2026) .......................................................................................................... 8
DOI Handbook of NEPA Procedures (2026) ........................................................................... 17
Forbes Breaking News, *Trump Goes On Ten-Minute Rant About Plan For Lincoln Memorial Reflecting Pool 'Beautification'*, YouTube (Apr. 23, 2026) ....................................................... 9
Merriam-Webster Dictionary, *Routine* ...................................................................................... 7

NPS, *Cultural Landscape Report, West Potomac Park, Lincoln Memorial Grounds* (Aug. 1999) (1999 CLR) ............................................................................................................. 6, 7

NPS, *Programmatic Agreement Among the National Park Service, the Advisory Council on Historic Preservation, and the National Conference of State Historic Preservation Officers for Compliance with Section 106 of the National Historic Preservation Act* (2008) (2008 PA) ......................................................................................................... 3, 4, 5, 6, 7, 9

NPS, *Programmatic Agreement National Guidance Document* (2022) (PA Guidance) ……. 3, 10

NPS Planning, Environment and Public Comment (PEPC) ..................................................... 3, 10

Press Release, AMERICA'S GREAT OUTDOORS: *Salazar Announces Successful Renovation of Lincoln Memorial Reflecting Pool* (Aug. 7, 2012) ..................................................... 16

Heather Richards & Rylan DiGiacomo-Rapp, *Trump's Reflecting Pool Spruce-Up Fails to Charm Preservationists*, Politico (Apr. 28, 2026) ........................................................... 8

Darlene Superville, *Trump Drives Across Lincoln Memorial Reflecting Pool to Inspect New Blue Coating He's Putting On It*, AP (May 7, 2026) ............................................................ 8

Robert Tait, *Workers Racing to Turn Reflecting Pool Blue for Trump May Be At Risk, Union Warns*, Guardian (May 17, 2026) ........................................................................... 8, 16

Donald J. Trump (@realDonaldTrump), Truth Social (May 16, 2026) ....................................... 8

**INTRODUCTION**

The law is straightforward: Before the government may alter one of the nation's most sacred spaces, Congress requires the government to conduct a deliberate review that allows key stakeholders and the public the ability to weigh in. But Defendants decided to forgo that well-trod path in this case. Instead, Defendants barged ahead and began resurfacing the Lincoln Memorial's Reflecting Pool in "American flag blue." That project is ongoing. If it is completed, this alteration will fundamentally and abruptly transform an iconic monument without any transparency or deliberation—the very thing that Congress sought to avoid when it enacted the NHPA and NEPA.

Before the Court, Defendants now assert that they conducted a "streamlined review," which they say means they complied with the law. But this paper-thin argument falls apart under gentle scrutiny. The streamlined review process is reserved for routine projects that do not change the historic features of a property, which the ongoing painting plainly does. The Court need not take Plaintiffs' word for it. It can look to the documents *Defendants* submitted to the Court. Defendants' own documents state that *they knew the repainting was not eligible for streamlined review*. Instead, Defendants are willfully violating the law because they felt *political pressure* from "White House leadership" to operate on a lightning-fast timeline. Because the passage is so damning, we reproduce it in full:

> While normally **not eligible for Streamlined Review due to the change to an epoxy coating, given the direction provided by** [National Park Service], [Department of the Interior], and **White House leadership coupled with the timeline required to complete compliance, there is no option other than to select Streamlined Review**. **No Streamlined Activity clearly aligns with this undertaking** . . . . Consultation with the DC [State Historic Preservation Office] would probably result in non-concurrence with an agency official proposed finding of No Adverse Effect. Significant and timely consultation would be required to reach consensus with the SHPO of a No Adverse Effect finding **based on the historic precedent of tinting the pool bottom**.

ECF No. 12-10 at 5 (bolding added).

This is an astonishing admission. Again, Defendants purposely flouted the statutes that Congress passed because of political pressure. They knew streamlined review was not appropriate, and that their new blue paint is a significant alteration of this sacred memorial. This is a textbook example of "arbitrary and capricious" agency action, and Defendants' admission confirms that Plaintiffs are likely to succeed on the merits. Defendants' admission also underscores the stark equities of this case. Defendants should not be able to evade *equitable* relief before a Court because they willingly decided to break the law.

Faced with this concerning record, Defendants make noise about standing and irreparable harm. But their arguments do not wash. Plaintiffs possess standing and will suffer irreparable harm absent relief. Defendants are defacing a historic landmark that Plaintiff Birnbaum cherishes and regularly enjoys, and Defendants are depriving Plaintiffs of the ability to participate in the legal process designed to prevent this precise form of hasty desecration to a national monument. Finally, Defendants cited the upcoming 250th anniversary of the Declaration of Independence as an excuse to evade review. But the public's interest is never served when its government flouts the law—let alone in a way that threatens damage to a sacred memorial shared by all Americans.

The Court should enter a TRO.

## ARGUMENT

### I.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS

Defendants argue that (i) they complied with the National Historic Preservation Act ("NHPA") by completing a streamlined review under a programmatic agreement, and (ii) they complied with the National Environmental Policy Act ("NEPA") by applying a categorical exclusion. Both arguments are wrong.

2

### A.    Defendants Brazenly Violated the NHPA

Start with Defendants' failure to comply with the review processes required by the NHPA. The documents Defendants produced prove the repainting did not qualify for streamlined review. And even if the project did qualify for streamlined review (it does not), Defendants still failed to provide the necessary notice and opportunity to comment to the public. In short, Defendants violated the NHPA twice over. This is not a close call.

### 1.    The 2008 Programmatic Agreement

A brief recap of the law. Under NHPA regulations, agencies may develop procedures "to govern the implementation of a particular program or the resolution of adverse effects from certain complex project situations or multiple undertakings" so long as those procedures remain consistent with NHPA. 36 C.F.R. § 800.14(b). In 2008, the National Park Service adopted a "Programmatic Agreement for Compliance with Section 106 of the National Historic Preservation Act" (the "2008 PA").[1] The 2008 PA established a streamlined review process for sixteen categories of eligible undertakings. *See* 2008 PA at 9, 11-20. If an undertaking is (1) eligible for streamlined review *and* (2) the agency finds that there will be no adverse effects to a historic property, no further consultation is required. *Id.* at 10-11. However, further consultation is required if specifically requested by, among others, the state preservation office—here, the DC SHPO. *Id.* at 9. Furthermore, the agency must document the streamlined process. *Id.* at 11.

Significantly, the 2008 Programmatic Agreement also does not displace NHPA's public notice requirements. Because "[t]he views of the public are essential to informed Federal decisionmaking in the section 106 process, . . . [t]he agency official must, except where appropriate to protect confidentiality concerns of affected parties, provide the public with

---

[1] https://parkplanning.nps.gov/document.cfm?documentID=66116.

information about an undertaking and its effects on historic properties and seek public comment and input." 36 C.F.R. § 800.2(d)(1)-(2). *See* NPS Nationwide Programmatic Agreement National Guidance Document 25 (2022)[2] ("PA Guidance") (describing generally applicable public participation requirements).[3]

Accordingly, even under streamlined review, Defendants were "required to use the NPS [Planning, Environmental and Public Comment ("PEPC")] system for public involvement and to meet public outreach requirements," such as "newspaper articles, reports being made available in libraries, and uploading notices about available reports to local online messaging boards." *Id.*; *see also id.* at 34 ("Since January 1, 2017, the use of PEPC to track and document Section 106 compliance has been mandatory."). "Common examples of what constitutes the public include . . . local or associated organizations such as local or state historic preservation advocacy groups, recreational organizations, [and] park "friends" groups." *Id.* at 25.

### 2. *The Resurfacing of the Reflecting Pool is Not Eligible for Streamlined Review, As Defendants' Decisional Document Admits*

The first defect in Defendants' reliance on streamlined review is that the resurfacing of the Reflecting Pool is not *actually* an eligible undertaking under the terms of the 2008 PA, as Defendants' own decisional document admits. Although the "Assessment of Actions Having an Effect on Historic Properties" ("Assessment"), ECF No. 12-10, prepared on March 27, 2026, concludes that the project "meets all conditions for a streamlined review" and that it will have "no

---

[2] NPS, *Programmatic Agreement Among the National Park Service (U.S. Department of the Interior), the Advisory Council On Historic Preservation, and the National Conference of State Historic Preservation Officers for Compliance with Section 106 of the National Historic Preservation Act* (2008), https://www.nps.gov/orgs/1966/upload/2022-06-06-PA_Guidance_508_2022-0606-3.pdf.

[3] These notice and comment requirements are contained in Subpart A of 36 C.F.R. Part 800. Subpart B of the regulations which is entitled "The section 106 process," describes the standard Section 106 process. *See* 36 C.F.R. Part 800, Subparts A & B.

adverse effect," *id.* at 4, the document—prepared by an NHPA Specialist—discloses that this undertaking would "normally not [be] eligible for Streamlined Review due to the change to an epoxy coating" and that "No Streamlined Activity clearly aligns with this undertaking." *Id.* at 5. The Assessment further explains that the conclusion was *only* reached because, "given the direction provided by NPS-WASO, DOI, and White House leadership coupled with the timeline required to complete compliance, there is no option other than to select Streamlined Review." *Id.* Finally, the Assessment explains that "Consultation with the DC-SHPO would probably result in non-concurrence with an agency official proposed finding of No Adverse Effect. Significant and timely consultation would be required to reach consensus with the SHPO of a No Adverse Effect finding based on the historic precedent of tinting the pool bottom." *Id.*

This is *stunning.* Rather than justify the ultimate conclusion reached, the main decisional document admits that the project is "not eligible for Streamlined Review." Textbook principles of administrative law provide "that an agency's action must be upheld, if at all, on the basis articulated by the agency itself." *Motor Vehicle Manufacturers Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 50 (1983). If the reasoning before the agency directly contradicts the decision reached, that is classic arbitrariness. *E.g.*, *Dep't of Com.*, 588 U.S. at 785 (Courts "cannot ignore the disconnect between the decision made and the explanation given"). To be sure, the final agency decisionmaker can reach a decision differing from initial agency views, *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 658–59 (2007), but it has to explain *why* the agency is reaching the final decision it does based on reasoning in the record, *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016). Here, the reasoning in the final decisional document reasoning contradicts, rather than supports, the agency's decision.[4]

---

[4] The disconnect between Defendants' conclusion and reasoning is not limited to a single

But the Assessment does not merely show that the agency's decision plainly contradicted its own reasoning. To make matters worse, the Assessment also expressly states that the use of streamlined review was driven by political pressures rather than an attempt to conform to the requirements of statute. *See Dep't of Com.*, 588 U.S. at 781. The cherry on top of this sundae of arbitrariness is the frank admission that streamlined review was conducted because DC-SHPO would probably disagree with the finding of "No Adverse Effect," requiring a "[s]ignificant and timely" consultation. In other words, Defendants' documents show that streamlined review was conducted to shortcut and subvert the review process, which is obviously not a valid consideration under the 2008 PA.

Defendants attempt to wave off their fatal admissions of arbitrariness in the Assessment by characterizing them as a "stray paragraph" in the opinion of "a different decisionmaker." Opp. at 27, n. 10. But the basis on which the court judges the agency's decision is the record before the agency and the agency's reasoning supplied by the agency. *E.g.*, *Encino Motorcars*, 579 U.S. at 224; *State Farm*, 463 U.S. at 50. This glaring problem in the agency's reasoning was not cured when "the agency official responsible for the decision"—NPS Superintendent Kevin Griess— "ultimately concluded that streamlined review was appropriate because the undertaking would bring no adverse effects to historic properties, as it was compatible with historical design precedent

---

paragraph. On the third page, Defendants acknowledge that the project would "Add non-historic features/elements to a historic structure," "Alter or remove features/elements of a historic setting or environment," and "Add non-historic features/elements (inc. visual, audible, or atmospheric) to a historic setting or cultural landscape." ECF No. 12-10, at 3. Elsewhere, the report notes that "CLRs do not recommend painting the pool walls or bottom and CLIs have no historic documentation of painting." *Id.* at 4. The agency failed to offer a "satisfactory" explanation for the disconnect between these facts and its ultimate decision. *See, e.g., Ohio v. Env't Prot. Agency*, 603 U.S. 279, 292 (2024).

and did not amount to a comprehensive rehabilitation of the Reflecting Pool." Opp. at 27. The agency's actual decisional document does not explain the abrupt departure from its initial view. Counsel's assertion in the motion is not supported by the declaration which merely states in a conclusory fashion, that when the declarant "signed the Assessment, [he] determined that the project qualified for streamlined review under the Nationwide Programmatic Agreement based on that recommendation." ECF No. 12-1 ¶ 31. And even if Superintendent Griess could now explain his decisionmaking process, the Court cannot affirm agency decisions based on post hoc rationalizations. *E.g.*, *State Farm*, 463 U.S. at 50.

Furthermore, the statement that the project is not eligible for streamlined review was indisputably correct. The only category of undertaking which could potentially fit here is "Preservation, Maintenance, and Repair of Historic Properties." 2008 PA at 11. But the 2008 PA and the regulations make clear that the use of streamlined review for routine maintenance is "limited to actions for retaining and preserving, protecting and maintaining, and repairing and replacing *in-kind*, as necessary, materials and features, consistent with the Secretary of the Interior's Standards for the Treatment of Historic Properties (Standards)."[5] 2008 PA at 11 (emphasis added). "[D]istinctive materials, features, finishes and construction techniques or examples of craftsmanship that characterize a property will be preserved." 36 C.F.R. § 68.3(a)(5). Any new materials or features "will *match the old* in composition, design, color and texture." *Id.* §§ 68.3(a)(6), (b)(6) (emphasis added). Indeed, the 2008 PA specifies that repainting—in

---

[5] As explained in the Complaint, the Standards publication was authored by Plaintiff Birnbaum during his service at the National Park Service. Compl. ¶ 15; *see also* U.S. Department of the Interior, The Secretary of the Interior's Standards for the Treatment of Historic Properties with Guidelines for the Treatment of Cultural Landscapes (1996), https://irma.nps.gov/DataStore/DownloadFile/514832. The standards are codified in 36 C.F.R. § 68.

particular—qualifies for streamlined review if it is conducted "in the *same color* as existing, or in similar colors or historic colors *based upon an approved historic structure report*, *cultural landscape report*, or a *historic paint color analysis*." 2008 PA at 12 (emphasis added).

Here, resurfacing the Reflecting Pool blue is plainly not "the same" as the current grey, achromatic basin. Birnbaum Suppl. Decl. ¶ 6. Nor is the new blue a "similar" or "historic" color *supported by a report.* Indeed, Defendants have not submitted any such report. Meanwhile, according to the 1999 Cultural Landscape Report ("1999 CLR"),[6] the historic color is an "asphalt coated membrane, slate, and concrete tile," which was chosen because that precise color "created the illusion of greater depth and a more profound reflection." 1999 CLR at 33; ECF No. 2-1, Birnbaum Decl. ¶ 25 (explaining that the grey basin is part of the historic design of the pool); ECF No. 2-5, Garland Decl. ¶ 7 (explaining that the grey basin is highly reflective and appropriate for a civic memorial landscape).[7] Furthermore, the use of an epoxy coating diverges from both existing and historic materials used in the pool. Birnbaum Suppl. Decl. ¶ 9. In short, nothing Defendants are doing matches " the old . . . composition, design, color, and texture," 36 C.F.R. §§ 68.3(a)(5)-(6), (b)(6), which is a necessary condition for streamlined projects, *see* 2008 PA at 11 (streamline review "limited to actions for retaining and preserving, protecting and maintaining, and repairing and replacing in-kind").

Nor can the current project[8] be properly characterized as "routine" maintenance in any way

---

[6] U.S. Department of the Interior, *Cultural Landscape Report, West Potomac Park, Lincoln Memorial Grounds* at 33 (Aug. 1999), https://npshistory.com/publications/linc/clr-lincoln-memorial-grounds.pdf.

[7] Indeed, during the 2010-2012 renovation project, NPS took care to use a "[s]pecially-designed tinted concrete" due to its "appearance and reflectivity." *See* Press Release, *America's Great Outdoors: Salazar Announces Successful Renovation of Lincoln Memorial Reflecting Pool* (Aug. 7, 2012), https://www.doi.gov/news/pressreleases/AMERICAS-GREAT-OUTDOORS-Salazar-Announces-Successful-Renovation-of-Lincoln-Memorial-Reflecting-Pool

[8] By Defendants' own description, the project includes "shotblast[ing] the entirety of the pool floor

36 C.F.R. § 800.14(b)(1). There is nothing "routine" about the project. *See Routine*, Merriam-Webster Dictionary, definition 1 (defining "routine" as "of a commonplace or repetitious character"). Defendants have now confirmed that they removed the expansion joints from Reflecting Pool, and the pool cannot currently be filled with water. ECF No. 12-1 ¶ 47. The scale and scope of the project is unlike anything that has been attempted since the years-long rehabilitation of the Reflecting Pool in 2010.

Indeed, the scope is so significant that the current cost—over $13 million—is nearly half the total budget of the replacement of the pool in 2010-2012.[9] The government itself agrees this is not routine. In President Trump's words, Defendants "[h]ave substantially upgraded construction materials, including surface qualities, sandblasting granite, and exterior stone and walkways" and he "made this a much larger job than originally contemplated for purposes of Beauty, and a much longer life." Donald J. Trump (@realDonaldTrump), Truth Social (May 16, 2026, 5:40 PM), https://truthsocial.com/@realDonaldTrump/posts/116586421680561291. In the President's words: the impact is intended to be lasting and to "get this job done for many generations to come." Robert Tait, *Workers Racing to Turn Reflecting Pool Blue for Trump May Be At Risk, Union Warns*, Guardian (May 17, 2026), https://www.theguardian.com/us-news/2026/may/17/trump-washington-dc-reflecting-pool (quoting Department of Interior spokesperson). In no sense is this

---

surface," "sandblasting the vertical portions of the Reflecting Pool walls," "removal of all existing product, including existing backer rod, installation of new backer rod and filling all expansion joints with the Rhino CCW polyurea product to level with the pool surface," "filling and caulking of any other cracks observed in the floor of the pool," "apply[ing] . . . polyurea to cover all expansion joints," "prim[ing] the floor and walls of the pool . . . [with] epoxy primer at the prescribed thickness of 5mm," and "apply[ing] the Rhino Pipeliner 5000 product as the final coat . . . at the prescribed thickness of +/- 100 mm." ECF No. 12-10 at 2.

[9] *See* Suzanne Blake, *How Trump's Lincoln Memorial Repair Projects Compare to Predecessors'*, Newsweek (May 12, 2026), https://www.newsweek.com/how-trumps-lincoln-memorial-repair-projects-compare-to-predecessors-11942961.

project "routine" maintenance.

Moreover, President Trump explained that he intended to change the color. As the President explained, the goal is to make the reflecting pool "look far more beautiful than it did in 1922." Heather Richards and Rylan DiGiacomo-Rapp, *Trump's Reflecting Pool Spruce-Up Fails to Charm Preservationists,* Politico (April 28, 2026), https://www.politico.com/news/2026/04/28/trumps-reflecting-pool-spruce-up-fails-charm-preservationists-00895457. The choice of color was not driven by routine maintenance or repair considerations—and certainly not historic preservation concerns—but instead reflected the President's personal choices. *See Forbes Breaking News, Trump Goes On Ten-Minute Rant About Plan For Lincoln Memorial Reflecting Pool 'Beautification'*, YouTube (Apr. 23, 2026), https://www.youtube.com/watch?v=D_Fn5fxW55s.[10]

In sum, because the resurfacing was not eligible for streamlined review, Defendants were required to conduct a standard review under 36 C.F.R. Part 800, which they failed to do. *See* 2008 PA at 20 ("All undertakings that do not qualify for streamlined review . . . will be reviewed in accordance with 36 CFR Part 800.").[11]

---

[10] It is notable that nothing in the documents Defendants provided explain why Defendants chose to paint the pool blue. Nor did Defendants offer any rationale for why the color they selected is at all consistent with historic preservation principles, especially when historic reports "do not recommend painting the pool walls or bottom and . . . have no historic documentation of painting." ECF No. 12-10 at 4. The Assessment instead only states that a tinted surface is "consistent with the historic character" but does not make any effort to explain why or how a blue tint specifically fits within this design and history. *Id.* at 5. Similarly, the declaration merely states that "American Flag Blue, a dark and muted, low chroma, color was selected for the liner." ECF No. 12-1 at 9; *see Mozilla Corp. v. FCC*, 940 F.3d 1, 60 (D.C. Cir. 2019) (agency acts arbitrarily where it fails "consider and address . . . an important aspect of the problem."). It bears emphasis: This color was picked on a whim.

[11] For the same reason, it was unreasonable for the agency to make a finding of "No Adverse Effect," a separate reason why streamlined review was not available. An example of adverse effect is "[a]lteration of a property, including restoration, rehabilitation, repair, [or] maintenance . . . that is not consistent with the Secretary's standards for the treatment of historic properties." 36 C.F.R.

### 3.    Defendants' Failure to Provide Notice is an Independent Violation of the NHPA

Even if Defendants could rely on streamlined review—and they cannot—they nonetheless had a duty to involve the public and provide information and an opportunity to comment. *See* 36 C.F.R. § 800.2(d)(1)-(2); *see also id.* § 800.14(b)(2)(iv) (mandating disclosure of "internal agency procedures implementing" a programmatic agreement). For the streamlined process specifically, the agency must provide (1) a "statement on why the proposed undertaking qualified as a streamlined activity," (2) a "map and/or diagram" of the affected area, (3) "[m]emos and comments on the [agency staff's] evaluation of the anticipated effect of the proposed undertaking on historic properties." PA Guidance at 34. The agency must publicize all of these documents on the PEPC website. *Id.*

Defendants failed to provide any notice of the plan to resurface the Reflecting Pool. *See* https://parkplanning.nps.gov/parkHome.cfm?parkID=427 (search for "reflecting pool"). In addition, when Plaintiffs contacted NPS about the project to inquire about Section 106 review, their inquiries were ignored. *See* Birnbaum Decl. ¶¶ 14-15, Exs. A-B. Defendants did not simply forget to provide notice to the public. They affirmatively avoided responding to inquiries about the project. This failure to engage the public is a standalone violation of the NHPA. It was only because of this lawsuit that Defendants finally shared basic information about the project with the public.

### 4.    There is no "harmless error"

Finally, Defendants half-heartedly argue that any violation of NHPA (or, for that matter, NEPA) is harmless error. Opp. at 28. There is no requirement that a plaintiff demonstrate that the

---

§ 800.5(a)(2)(ii). As explained above, resurfacing a historic property in a *different* material and *different* color violates the principles twice over.

11

outcome of the agency deliberations would have been different had the agency followed the law. If a court finds a violation, "the court should generally reverse and remand even though it discerns a possibility, *even a strong one*, that by another course of reasoning the agency might come to the same result." *Food & Drug Admin. v. Wages & White Lion Invs., L.L.C.*, 604 U.S. 542, 591 (2025) (emphasis in original). That general rule holds special force when the violation openly conflicts with the procedures that Congress designed specifically to improve agency decisionmaking. *See, e.g.*, *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989). Defendants' bypassing of the processes that Congress required caused material prejudice not only to Plaintiffs and others who were denied their chance to participate in the process but deprived Defendants of a valuable perspective in their decisionmaking. *See, e.g.*, *City of Port Isabel v. FERC*, 111 F.4th 1198, 1211 (D.C. Cir. 2024) ("[E]rror is prejudicial because it deprived petitioners and the public of an adequate 'springboard for public comment.'" (quoting *Robertson*, 490 U.S. at 349)).

## B.    Defendants Violated NEPA

Defendants similarly assert that they complied with NEPA by applying a categorical exclusion for "[r]outine maintenance and repairs to cultural resource sites, structures, utilities and grounds under an approved Historic Structures Preservation Guide or Cyclic Maintenance Guide; or if the action would not adversely affect the cultural resource." ECF No. 12-9, at 3 (citing DOI NEPA Handbook, Appendix 2, 12.5, C(4), (Feb. 2026)). But there is nothing "routine" about the significant changes that Defendants are making; Defendants have not established their work was done pursuant to a historic preservation guide or otherwise without affecting the cultural resource; and Defendants' finding that no extraordinary circumstances apply here is arbitrary and capricious.

An agency may forgo preparing an environmental impact statement or an environmental assessment altogether if the proposed action is "categorically excluded" from NEPA's usual

requirements because it "[n]ormally does not have significant effects on the environment." *Marin Audubon Soc'y v. Fed. Aviation Admin.*, 121 F.4th 902, 907 (D.C. Cir. 2024) (citation modified); 42 U.S.C. § 4336e(1); 43 C.F.R. § 46.205(h). In order to invoke a categorical exclusion, Defendants must show that two requirements are satisfied. *See* Opp. at 29. First, the project must fit within the scope of an applicable categorical exclusion. 42 U.S.C. § 4336(a)(2); 43 C.F.R. § 46.205. Second, the agency must determine that no "extraordinary circumstances" apply that render application of a categorical exclusion inappropriate. 43 C.F.R. § 46.210 (citing *id.* § 46.215). "The decision to invoke a categorical exclusion under NEPA is reviewed under the arbitrary and capricious standard." *Wash. Area Bicyclist Ass'n, Inc. v Burgum*, No. 26 Civ. 0988 (ABJ), 2026 WL 1078218, at \*24 (D.D.C. Apr. 21, 2026) (citing *Nat'l Trust for Hist. Pres. in U.S. v. Dole*, 828 F.2d 776, 781 (D.C. Cir. 1987)). "If a proposed action does not meet the criteria for any of the listed Departmental categorical exclusions or any of the individual bureau categorical exclusions, then the proposed action must be analyzed in an environmental assessment or environmental impact statement." 43 C.F.R. § 46.205(a).

*First*, Defendants' invocation of the categorial exclusion is based on their conclusion that the resurfacing constitutes "[r]outine maintenance and repairs to cultural resource sites, structures, utilities and grounds under an approved Historic Structures Preservation Guide or Cyclic Maintenance Guide; or if the action would not adversely affect the cultural resource." ECF No. 12-9, at 3 (citing DOI NEPA Handbook, Appendix 2, 12.5, C(4), (Feb. 2026)); *cf.* 43 C.F.R. § 46.210(f) (Department of Interior regulation excluding "Routine and continuing government business, including such things as supervision, administration, operations, maintenance, renovations, and replacement activities having limited context and intensity (e.g., limited size and magnitude or short-term effects).").

This contention is baseless. As noted above, there is nothing "routine" about this project. Defendants' conclusion to the contrary relies on just a few lines of reasoning, the crux of which is simply that the "action would not expand, relocate, or replace the reflecting pool; would not remove the granite coping stones; and would not construct permanent new facilities." ECF No. 12-9 at 3. True, but irrelevant. Identifying a few changes that are *not* being made to the structure fails to explain why the extensive work that *is* being undertaken fits within the categorical exclusion. By the logic of the agency's reasoning, covering the Washington Monument with bright orange paint would also qualify as routine maintenance because it similarly would not relocate the monument to a new location.

*Second*, even if the Court were to uphold the agency's view that the overhaul of the Reflecting Pool could constitute "routine maintenance or repairs," Defendants cannot invoke the categorical exclusion because routine work must be conducted "under an approved Historic Structures Preservation Guide or Cyclic Maintenance Guide; or if the action would not adversely affect the cultural resource." Defendants' decisional document does not offer *any* explanation as to how or why the latter part of the exclusion was met. Nor could they: as set forth more fully above, the work is flatly inconsistent with the Department of Interior's own standards for treatment of historic properties which require "match[ing] the old . . . design, color, and texture." 36 C.F.R. § 68.3(a)(5)-(6), (b)(6). Because Defendants' invocation of the categorical exclusion does not address this glaring problem, the decision is quintessentially arbitrary and capricious. *See, e.g.*, *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1, 25 (2020) (agency decision is arbitrary and capricious when agency failed to consider important aspects of the problem).

*Third*, Defendants also cannot rely on a categorical exclusion when "extraordinary

14

circumstances" are present. 43 C.F.R. § 46.205(c). Such extraordinary circumstances exist when, among other things, the project has a "significant impact[] on properties listed, or eligible for listing, on the National Register of Historic Places." 43 C.F.R. § 46.215(f).

Defendants apparently concluded that extraordinary circumstances did not apply because the "work is limited to maintenance and repair of the existing pool basin within its current footprint." ECF No. 12-9, at 4. But even so-called "maintenance and repair" to a historic property that stays "within [a structure's] current footprint" can have a significant impact on the structure if it departs from its historical character. Defendants' failure to consider the significance of their changes to the reflecting pool and the surrounding historic landscape demonstrates a glaring defect in the decisionmaking process. The agency's cursory refusal to find extraordinary circumstances here is arbitrary and capricious. *See, e.g.*, *Wash. Area Bicyclist Ass'n*, 2026 WL 1078218, at \*24.

## II.    PLAINTIFFS HAVE STANDING AND WILL SUFFER IRREPARABLE HARM ABSENT RELIEF

Although Plaintiffs need only identify one plaintiff and one form of irreparable harm to secure the requested injunction, Plaintiffs have articulated three distinct but related harms that Defendants have caused and which are ongoing. These irreparable harms provide a basis for the Court's Article III jurisdiction and warrant preliminary injunctive relief.

*First*, aesthetic injuries of the sort experienced by Mr. Birnbaum are "undeniably" recognized by federal courts and provide a basis for Article III standing. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 562–63 (1992) ("Of course, the desire to use or observe an animal species, even for purely esthetic purposes, is undeniably a cognizable interest for purpose of standing."); *accord, e.g., Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 184 (2000) ("[P]laintiffs adequately allege injury in fact when they aver that they use the affected area and are persons 'for whom the aesthetic and recreational values of the area will be lessened' by the

15

challenged activity." (quoting *Sierra Club v. Morton*, 405 U.S. 727, 735 (1972)); *Animal Legal Def. Fund, Inc. v. Glickman*, 154 F.3d 426, 432 (D.C. Cir. 1998) (en banc) (collecting cases). Plaintiff Birnbaum's declaration establishes that he regularly visits and cherishes the Reflecting Pool, and he will enjoy it less if the color of the bottom is changed. *See* Birnbaum Decl. ¶¶ 23-26; Birnbaum Supp. Decl. ¶ 6; Compl. ¶¶ 17-18.  Indeed, he visited it just a few days ago. Birnbaum Supp. Decl. ¶ 2.

Defendants ask the Court to ignore Plaintiff Birnbaum's aesthetic harm (1) because his harm is based (in their view) on a "misunderstanding" about the exact shade of blue which will coat the reflecting pool[12] and because the liner will sit below the waterline; and (2) because the color can be changed back. Opp. at 12, 19-20.

Defendants are wrong. It does not matter just how vibrant (or not) American flag blue is in the end. Mr. Birnbaum is harmed because Defendants are demolishing the particular, very unique grey color that is essential to his enjoyment of the Reflecting Pool . *See* Birnbaum Decl. ¶ 25 (stating that he values the historic "grey, achromatic basin" of the Reflecting Pool, which has "remained essentially that same color since it was first installed more than a century ago," and that changing the color from "achromatic grey" to "blue" would alter his experience); Suppl. Birnbaum Decl. ¶ 6 ("The surfaces currently coated in what appears to be the final coating are not achromatic, are not consistent with the historic character or design of the property, and are significantly different from the color of the basin prior to the resurfacing. Accordingly, the color treatment being applied to the Reflecting Pool will significantly diminish my aesthetic enjoyment of the Reflecting

---

[12] Notably, Defendants' opposition boldly—and wrongly—asserts that the pool basin will be "achromatic." Opp. at 12 (citing ECF No. 12-1 ¶ 22-23). To begin with, blue is, by definition, not achromatic. Indeed, Defendants' own declaration cited in the brief describes the blue color as "low chroma," not achromatic. ECF No. 12-1 ¶ 22. Those are not the same thing.

Pool.").

The color will change, and it will have a negative impact on the reflectivity of the pool. *See* Garland Decl. ¶ 6 ("Dark, colorless surfaces maximize reflectivity."), ¶ 8 ("Painting the basin blue fundamentally undermines [the Reflecting Pool's] design purpose. Blue is not a neutral reflective surface.").

Finally, this harm warrants equitable relief because it irrevocably interferes with Mr. Birnbaum's enjoyment of a personally and professionally significant "cherished" place. *See* Birnbaum Decl. ¶¶ 24, 26. Defendants may disagree with Mr. Birnbaum's aesthetic perspective. But that does not lessen either his standing or his irreparable injury. Indeed, with every day that passes, Mr. Birnbaum loses his ability to enjoy the reflecting pool—and he does not get that opportunity back. *See San Luis Valley Ecosystem Council v. U.S. Fish & Wildlife Serv.,* 657 F. Supp. 2d 1233, 1241 (D. Colo. 2009) (finding that even temporary harm to the plaintiffs' aesthetics interests were irreparable); *see also Nat'l Tr. for Historic Pres. v. Nat'l Park Serv.*, No. 25 Civ. 4316 (RJL), 2026 WL 877779, at *14 (D.D.C. Mar. 31, 2026) (finding that if construction of White House ballroom proceeds, "the harm of an enormous ballroom overshadowing the White House grounds would indeed be permanent").

Defendants suggest that none of this matters because Defendants could later—one day— add more primer and epoxy to again repaint the pool grey. But that does not remedy the harm to Mr. Birnbaum in the interim. Nor would it fix the problem. Primer and epoxy are not the "[s]pecially-designed tinted concrete" that NPS installed during the last renovation after careful deliberation, which produces a very specific visual effect. Suppl. Birnbaum Decl. ¶ 9 (quoting Press Release: AMERICA'S GREAT OUTDOORS: Salazar Announces Successful Renovation of      Lincoln      Memorial      Reflecting      Pool      (Aug.      7,      2012),

17

https://www.doi.gov/news/pressreleases/AMERICAS-GREAT-OUTDOORS-Salazar-Announces-Successful-Renovation-of-Lincoln-Memorial-Reflecting-Pool). In short, simply changing the color of the epoxy will not restore the pool to its pre-project state. "Adding additional layers of primer and tinted epoxy on top of the layers now being applied does not restore the specially-designed tinted concrete that NPS chose after extensive study during the last renovation; it further departs from it." *Id.*[13]

*Second*, Defendants ask the Court to dismiss the procedural harms Plaintiffs suffered on the premise that the ability to obtain information and to participate in the review process—whether as a consulting party or a member of the public[14]—is an abstract or "insubstantial" harm. Opp. at 15, 21.

Not so. Consulting parties and the public are "essential" to agency decisionmaking. 36 C.F.R. § 800.2(d).[15] That is particularly true for Plaintiffs, who possess unique and directly

---

[13] Notably, Defendants argue that corrective action is only theoretically available because they would oppose such relief. *See* Mot. at 20. This itself suggests that the harms are not reparable in any meaningful sense, and completion of the project is not going to improve Plaintiffs' equitable position to obtain specific relief. Judge Leon flagged this real risk in finding irreparable harm in the ballroom case. *See Nat'l Tr. for Historic Pres. v. Nat'l Park Serv.*, No. 25 Civ. 4316 (RJL), 2026 WL 877779, at *15 (D.D.C. Mar. 31, 2026) ("Once the building is complete, any aesthetic harm would be beyond remediation and courts typically find challenges to completed projects to be moot." (cleaned up)).

[14] For the avoidance of doubt, the fact that Plaintiffs also have informational and procedural rights as members of the public does not render their claims a generalized grievance. "The fact that an injury may be suffered by a large number of people does not of itself make that injury a nonjusticiable generalized grievance." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016). As long as Plaintiffs have a particularized injury—which they do due to their concrete stake in historic preservation and the Reflecting Pool—the fact that others are also entitled to the information does not rob them of standing.

[15] Defendants' NEPA handbook recognizes that agencies can "benefit from receiving information from the public" and that "[m]embers of the public may have unique insight into issues that warrant consideration in the environmental document." DOI Handbook 29, App'x 1. Invoking a categorical exclusion pretermits the agency's ability to consider whether to seek potentially useful public feedback during the usual NEPA process.

18

relevant expertise and experience which they wish to impart and improve agency decisionmaking. *See* Birnbaum Decl. ¶ 19. Plaintiffs' prior experience shows that they have, in fact, effectively used the Section 106 process to advocate and save numerous historical landmarks. *See id.* ¶ 8-9. For the same reasons, the procedural harms are not "in vacuo" as Defendants assert. Opp. at 23. On the contrary, because Defendants robbed Plaintiffs of the ability to participate in the deliberative process, they prevented Plaintiffs from fulfilling their mission and, in this case, to advocate against the alteration of a treasured historic landmark. *See* Birnbaum Decl. ¶ 8-9, 18-19. Accordingly, these harms are sufficiently concrete for purposes of Article III standing.

These procedural harms are also, by definition, irreparable. The Section 106 and NEPA reviews are supposed to occur *before* an undertaking takes place. *See* 36 C.F.R. § 800.1(c) ("The agency official must complete the section 106 process prior to the approval of the expenditure of any Federal funds on the undertaking or prior to the issuance of any license."); *Com. of Mass. v. Watt*, 716 F.2d 946, 952 (1st Cir. 1983) (Breyer, J.), *abrogated on other grounds*, *Marsh v. Oregon Nat. Res. Council*, 490 U.S. 360 (1989) ("NEPA is designed to influence the decisionmaking process; its aim is to make government officials notice environmental considerations and take them into account. Thus, when a decision to which NEPA obligations attach is made without the informed environmental consideration that NEPA requires, the harm that NEPA intends to prevent has been suffered.").

*Third*, Plaintiffs also suffer informational harms. Defendants do not challenge that such injuries are generally actionable and irreparable. They merely assert that Plaintiffs have—*as a result of this lawsuit*—now received all the information to which they are entitled. Opp. at 17, 23-24.

This is wrong. To begin with, Defendants have disclosed little of their assessment of

19

environmental impacts, so the informational harms that result from the failure to comply with NEPA have not been addressed at all. With respect to the NHPA, Plaintiffs have now obtained *some* information. But the little Defendants provided in response to Plaintiffs motion pales in comparison to the information typically generated in a standard Section 106 review. For example, during the 2010 evaluation of the last rehabilitation project, NPS produced over 20 documents extensively documenting the planned changes and engagement with various parties. *See* https://parkplanning.nps.gov/documentsList.cfm?projectID=26512. Defendants argue that the law does not require more. Opp. at 15-16. But Defendants are wrong.[16]

Finally, Defendants make a throwaway argument about redressability. Opp. at 17. But it is meritless. Article III's "redressability requirement is met when correcting the alleged procedural violation *could* still change the substantive outcome in the [plaintiff's] favor; the [plaintiff] need not go further and show that it *would* effect such a change." *Narragansett Indian Tribal Historic Pres. Off. v. FERC*, 949 F.3d 8, 13 (D.C. Cir. 2020) (emphasis in original). Were Defendants to reconsider their decision, engage with Plaintiffs and others with an interest, and properly consider historic and environmental values in their management of the reflecting pool, there is every chance that the reflecting pool would be preserved. Defendants' flouting of their statutory obligations caused the Plaintiffs' injuries, and this Court has the power to order Defendants to follow the law.

## III.  THE BALANCE OF EQUITIES AND PUBLIC INTEREST FAVORS PLAINTIFFS

The balance of equities tilts decisively in Plaintiffs' favor. Plaintiffs—and the public— have a compelling interest in protecting a cherished national monument and in making sure that

---

[16] Defendants' claim that disclosures are only triggered by a finding of adverse effects, Opp. 23, is wrong twice over. First, Plaintiffs are challenging that finding itself, so Defendants cannot rely on it to dispute the harm to Plaintiffs. Second, as explained above, disclosures about the project are required under NHPA regardless of a finding of adverse effects and regardless of which review process the agency uses.

the Government follows the law—the law that was designed to carefully, methodically consider effects of agency actions on the historic properties.

Defendants' assertion that a TRO would, in fact, undermine Plaintiffs' interests is based on the twin premises that (1) it is better for Plaintiffs to have *some* version of the Reflecting Pool as soon as possible than it is to protect the Reflecting Pool and (2) the TRO would delay Plaintiffs' goals. Both are false. The sooner the work stops and the NHPA/NEPA review occurs, the sooner the Reflecting Pool can be restored to its preexisting state. It is a particular kind of chutzpah for Defendants to suggest what is best for Plaintiffs.

This may mean that the pool is closed on July 4th. But it bears emphasis: This is Defendants' fault. The public is in no way served by allowing Defendants to flout the law. Defendants knew they were violating the NHPA and NEPA. They plowed ahead anyway—causing serious harm to a treasured national memorial. Defendants' current argument boils down to the remarkable claim that they have already done enough damage to the reflecting pool so they can continue their unlawful project. This is outrageous. If accepted, this argument would reward Defendants' bad faith actions in this and every case, contrary to the fundamental principle of equity practice. *See Root v. Lake Shore & M.S. Ry. Co.*, 105 U.S. 189, 207 (1881) ("[I]t would be inequitable that [the wrongdoer] should make a profit out of his own wrong.").

## IV.     THE COURT SHOULD WAIVE ANY BOND REQUIREMENT

The Court should waive a bond or require only a nominal bond. Under Rule 65(c), district courts may impose a bond in any "amount that the court considers proper," including no bond at all. *Sutton Invs. LLC v. Perlmutter*, No. 1:21-CV-3226 (CJN), 2021 WL 6062635, at *6 n.4 (D.D.C. Dec. 22, 2021).

Defendants make the extraordinary request that the Court require a $1.8 million bond.

21

Def.s' Opp. 32 (citing NPS Decl. at ¶ 46). But Defendants fail to explain the basis for that figure. *See Nat. Res. Def. Council, Inc. v. Morton*, 337 F. Supp. 167, 169 (D.D.C. 1971) (stating it "would be a mistake to treat a revenue loss to the Government the same as pecuniary damage to a private party"). Moreover, "federal courts typically require substantial bonds only in suits between private parties with significant monetary interests at stake." *Escobar Molina v. U.S. Dep't of Homeland Sec.*, 811 F. Supp. 3d 1, 64 (D.D.C. 2025). Imposing a substantial bond would inequitably impair the plaintiffs' ability to enforce their statutory rights and obtain judicial review of agency decisions as Congress provided. *See, e.g., N. Am.'s Bldg. Trades Unions v. Dep't of Def.*, 783 F. Supp. 3d 290, 315 (D.D.C. 2025). Accordingly, this Court should exercise its discretion to waive the bond requirement, or, at most, require only a nominal bond.

22

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court grant the TRO and preliminary injunction. Plaintiffs also respectfully request that the Court hold an expedited hearing on the motion pursuant to LCvR 65.1(d).

Dated: May 19, 2026

Respectfully submitted,

/s/ Alexander Kristofcak
ALEXANDER KRISTOFCAK*
   (D.D.C. Bar No. NY0717)
JOSEPH MEAD
   (D.D.C. Bar No. 1740771)
NATHANIEL A.G. ZELINSKY
   (D.C. Bar No. 1724093)

WASHINGTON LITIGATION GROUP
1717 K Street NW, Suite 1120
Washington, DC 20006
Phone (202) 521-8734
Fax (202) 521-8745
akristofcak@washingtonlitigationgroup.org

* *Admitted only in California and New York; practicing under the supervision of D.C. Bar members*

*Attorneys for Plaintiffs*

23