**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

THE CULTURAL LANDSCAPE FOUNDATION
et al.,

                *Plaintiffs*,

     *v.*

U.S. DEPARTMENT OF THE INTERIOR et al.,

                *Defendants*.

No. 26 Civ. 1593

**<u>PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS</u>**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................ iii

INTRODUCTION ............................................................................................................... 1

BACKGROUND .................................................................................................................. 3

I.          LEGAL BACKGROUND ................................................................................ 3

      A.     The National Historic Preservation Act ............................................. 3

      B.     The National Environmental Policy Act ............................................ 4

II.         FACTUAL AND PROCEDURAL BACKGROUND ...................................... 5

      A.     The Reflecting Pool's Character-Defining Design ........................... 5

      B.     The Resurfacing Project ..................................................................... 5

LEGAL STANDARD .......................................................................................................... 9

ARGUMENT ..................................................................................................................... 10

I.         PLAINTIFF BIRNBAUM HAS SUFFERED AN AESTHETIC INJURY ... 10

II.        TCLF HAS SUFFERED AN INJURY TO CONCRETE INTERESTS ........ 15

III.       PLAINTIFFS' INJURIES ARE REDRESSABLE ....................................... 18

CONCLUSION .................................................................................................................. 24

## TABLE OF AUTHORITIES

**Cases**

*Am. Fuel & Petrochemical Manufacturers v. Env't Prot. Agency,*
937 F.3d 559 (D.C. Cir. 2019) ...................................................................................... 12, 15

*Am.'s Cmty. Bankers v. F.D.I.C.,*
200 F.3d 822 (D.C. Cir. 2000) ............................................................................................ 19

*Animal Legal Def. Fund v. Glickman,*
154 F.3d 426 (D.C. Cir. 1998) ................................................................................. 10, 11, 12

*Beyond Nuclear, Inc. v. U.S. Nuclear Regul. Comm'n,*
--- F.4th ----, 2026 WL 2093882 (D.C. Cir. July 21, 2026) ..................................................... 20

*Bost v. Ill. State Bd. of Elections,*
607 U.S. 71 (2026) ........................................................................................ 1, 10, 19

*Byrd v. U.S. EPA,*
174 F.3d 239 (D.C. Cir. 1999) ............................................................................................ 21

*Campaign Legal Ctr. v. Fed. Election Comm'n,*
31 F.4th 781 (D.C. Cir. 2022) ...................................................................................... 14, 17

*Carpenters Indus. Council v. Zinke,*
854 F.3d 1 (D.C. Cir. 2017) ...................................................................................... 13, 21

*City of Waukesha v. EPA,*
320 F.3d 228 (D.C. Cir. 2003) ...................................................................................... 10, 18

*Ctr. for Biological Diversity v. EPA,*
861 F.3d 174 (D.C. Cir. 2017) ............................................................................................ 16

*Ctr. for Biological Diversity v. Zeldin,*
171 F.4th 356 (D.C. Cir. 2026) ...................................................................................... 13, 16

*Cutler v. U.S. Dep't of Health & Human Servs.,*
797 F.3d 1173 (D.C. Cir. 2015) ............................................................................................ 21

*Diamond Alternative Energy, LLC v. Env't Prot. Agency,*
606 U.S. 100 (2025) ............................................................................................ 18

*Env't Def. Fund v. FERC,*
2 F.4th 953 (D.C. Cir. 2021) ...................................................................................... 11, 12

*FEC v. Akins,*
524 U.S. 11 (1998) ............................................................................................ 15, 17

*First Choice Women's Res. Centers, Inc. v. Davenport,*
146 S. Ct. 1114 (2026) ............................................................................................ 13

*Food & Drug Admin. v. All. for Hippocratic Med.,*
602 U.S. 367 (2024) ............................................................................................ 19, 21

iii

*Found. on Econ. Trends v. Lyng*,
   943 F.2d 79 (D.C. Cir. 1991) ................................................................................................ 17

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*,
   528 U.S. 167 (2000) ................................................................................................... passim

*Humane Soc'y of U.S. v. Hodel*,
   840 F.2d 45 (D.C. Cir. 1988) ................................................................................................ 11

*L.M.-M. v. Cuccinelli*,
   442 F. Supp. 3d 1 (D.D.C. 2020) ......................................................................................... 21

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992) ................................................................................................... passim

*N. Am. Butterfly Ass'n v. Wolf*,
   977 F.3d 1244 (D.C. Cir. 2020) ........................................................................................... 21

*Narragansett Indian Tribal Historic Pres. Off. v. FERC*,
   949 F.3d 8 (D.C. Cir. 2020) ....................................................................................... 2, 20, 23

*People for the Ethical Treatment of Animals v. USDA*,
   797 F.3d 1087 (D.C. Cir. 2015) ..................................................................................... 17, 18

*Rumsfeld v. FAIR*,
   547 U.S. 47 (2006) ................................................................................................................ 15

*Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*,
   605 U.S. 168 (2025) .......................................................................................................... 4, 16

*Sierra Club v. Morton*,
   405 U.S. 727 (1972) .............................................................................................................. 14

*Spokeo, Inc. v. Robins*,
   578 U.S. 330 (2016) ......................................................................................................... 14, 16

*Sugar Cane Growers Coop. of Fla. v. Veneman*,
   289 F.3d 89 (D.C. Cir. 2002) ............................................................................................... 10

*Summers v. Earth Island Inst.*,
   555 U.S. 488 (2009) .............................................................................................................. 19

*Thole v. U. S. Bank N. A.*,
   590 U.S. 538 (2020) ................................................................................................................ 1

*Tyler v. Hennepin Cnty., Minnesota*,
   598 U.S. 631 (2023) ................................................................................................................ 9

*Uzuegbunam v. Preczewski*,
   592 U.S. 279 (2021) .............................................................................................................. 13

*Valley Forge Christian Coll. v. Americans United for Separation of Church & State*,
   454 U.S. 464 (1982) ......................................................................................................... 12, 13

iv

*Warth v. Seldin,*
  422 U.S. 490 (1975) ........................................................................................................... 9

**Statutes**

42 U.S.C. § 4336(a)(2) ........................................................................................................ 5

42 U.S.C. § 4336(b)(1) ........................................................................................................ 4

42 U.S.C. § 4336(b)(2) ........................................................................................................ 4

42 U.S.C. § 4336e(1) ........................................................................................................... 5

5 U.S.C. § 704 .................................................................................................................... 22

54 U.S.C. § 306108 .............................................................................................................. 3

**Rules**

Fed. R. Civ. P. 54(c) ......................................................................................................... 18

**Regulations**

36 C.F.R. § 800.2(c)(5) ................................................................................................... 3, 16

36 C.F.R. § 800.2(d) .......................................................................................................... 16

36 C.F.R. § 800.2(d)(1) .................................................................................................. 4, 18

36 C.F.R. § 800.2(d)(2) .................................................................................................. 4, 18

36 C.F.R. § 800.3 ................................................................................................................ 3

36 C.F.R. § 800.3(f)(3) .................................................................................................. 3, 16

36 C.F.R. § 800.4 ................................................................................................................ 3

36 C.F.R. § 800.5 ................................................................................................................ 3

36 C.F.R. § 800.6 ................................................................................................................ 3

36 C.F.R. § 800.11 ............................................................................................................ 16

36 C.F.R. § 800.11(a) .......................................................................................................... 3

36 C.F.R. § 800.14(b) .......................................................................................................... 4

43 C.F.R. § 46.205(a) .......................................................................................................... 5

43 C.F.R. § 46.215(b) .......................................................................................................... 5

43 C.F.R. § 46.215(f) ........................................................................................................... 5

**INTRODUCTION**

Earlier this year, the federal government awarded a no-bid contract to transform the Lincoln Memorial Reflecting Pool and rushed to fundamentally alter this sacred space. It did so with total disregard for the procedures established to protect our nation's historic landmarks and the environment. Today, the iconic pool sits empty, covered in peeling epoxy after a botched job. Meanwhile, the internal documents disclosed at the preliminary injunction stage demonstrate that the government knew it was violating the law—and proceeded anyway. Before this Court, the government does not defend its unlawful conduct. Instead, the motion to dismiss challenges whether Plaintiffs have suffered an Article III injury (they have) and whether the Court can provide a remedy (it can). Indeed, the government's motion is little more than a plea to remake settled precedent. The Court should decline to make "'standing law more complicated than it needs to be,'" and deny the motion. *Bost v. Ill. State Bd. of Elections*, 607 U.S. 71, 83 (2026) (quoting *Thole v. U. S. Bank N. A.*, 590 U.S. 538, 547 (2020)).

Starting with Plaintiff Charles Birnbaum's aesthetic injury: Mr. Birnbaum has enjoyed the Lincoln Memorial Reflecting Pool for relaxation and contemplation for many years and plans to do so in the future. The government's unlawful rush to alter the pool's character-defining historic feature—bypassing the required review processes—has materially degraded his enjoyment of this iconic landmark. This is the classic aesthetic injury that the Supreme Court has said, time and again, is "undeniably" a basis for Article III standing. *See Lujan v. Def. of Wildlife*, 504 U.S. 555, 562 (1992); *see also Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 183 (2000) (aesthetic injury established by asserting that plaintiffs "use the affected area and are persons for whom the aesthetic and recreational values of the area will be lessened by the challenged activity" (cleaned up)). Defendants take direct aim at settled precedent and attempt to

fashion new requirements for aesthetic standing—for instance, arguing that a plaintiff must change his conduct to have suffered a cognizable injury. But that is not the law. Full stop. The Court should deny the invitation to defy the Supreme Court's instructions and narrow aesthetic standing precedent into oblivion.

The Court has Article III jurisdiction based on Mr. Birnbaum's standing alone. But the organization he leads—Plaintiff TCLF—also has suffered a concrete Article III injury as a result of the government's refusal to undertake the most rudimentary historic preservation and environmental reviews. TCLF participates in those processes to fulfil its mission to preserve and protect cultural landscapes, including historic resources like the Reflecting Pool, and to obtain information that is critical to its operations. By circumventing these processes, Defendants have significantly undermined TCLF's mission and deprived TCLF of resources it needs. Defendants' assertion that TCLF's injury is unconnected to the organization's concrete interests simply ignores these facts.

Finally, Plaintiffs' injuries are redressable by a favorable ruling from this Court. A plaintiff injured by agency action done in violation of required procedures need only show that the lawsuit *could* lead to a different outcome, not that it would. *Narragansett Indian Tribal Historic Pres. Off. v. FERC*, 949 F.3d 8, 13 (D.C. Cir. 2020). Defendants argue that it is too late to provide a remedy because "the work is complete and the analysis is done." Mot. 16. But that is plainly wrong and defies the facts on the ground. Defendants have announced further work on the Reflecting Pool to fix their botched initial job. Regardless, as the Court previewed at the hearing regarding emergency relief, requiring Defendants to follow the law and undertake the reviews in good faith—including consulting appropriate experts and the public—could lead Defendants to restore the Reflecting Pool to its prior state.

**BACKGROUND**

I.    **LEGAL BACKGROUND**

A.    **The National Historic Preservation Act**

Section 106 of the National Historic Preservation Act ("NHPA") requires the head of any federal agency with jurisdiction over a proposed undertaking, "prior to the approval of the expenditure of any Federal funds on the undertaking," to "take into account the effect of the undertaking on any historic property." 54 U.S.C. § 306108.

The Advisory Council on Historic Preservation's regulations at 36 C.F.R. Part 800 prescribe how agencies discharge that duty: initiating the process and identifying consulting parties, *id.* § 800.3; identifying historic properties that may be affected, *id.* § 800.4; assessing adverse effects, *id.* § 800.5; and, where adverse effects exist, seeking to "avoid, minimize or mitigate" them through consultation, *id.* § 800.6. Throughout, the agency is subject to documentation requirements designed to "enable any reviewing parties to understand" the agency's determinations and findings. *Id.* § 800.11(a).

The process is participatory in two respects that matter here. First, organizations with "a demonstrated interest in the undertaking" may participate as consulting parties "due to . . . their concern with the undertaking's effects on historic properties," *id.* § 800.2(c)(5), and the agency official "shall consider all written requests of individuals and organizations to participate as consulting parties," *id.* § 800.3(f)(3). Second, and independently, because "[t]he views of the public are essential to informed Federal decisionmaking in the section 106 process," the agency official "shall seek and consider the views of the public" and must "provide the public with information about an undertaking and its effects on historic properties and seek public comment

3

and input." *Id.* § 800.2(d)(1)–(2). These public-participation obligations appear in Subpart A of the regulations, which governs the Section 106 process generally.

In lieu of the standard consultation process, an agency may negotiate a "programmatic agreement" to govern certain categories of repetitive activity, such as "routine management activities." *Id.* § 800.14(b). In 2008, NPS entered a nationwide programmatic agreement ("2008 PA") with the Advisory Council and the National Conference of State Historic Preservation Officers establishing a "streamlined" review process for qualifying undertakings, under which no consultation is generally required. First Amended Complaint ("FAC") ¶ 33; ECF No. 23. The 2008 PA's scope is expressly limited: "Use of the Streamlined Review Process is limited to actions for retaining and preserving, protecting and maintaining, and repairing and replacing *in-kind*, as necessary, materials and features, consistent with the Secretary of the Interior's Standards for the Treatment of Historic Properties." FAC ¶ 34 (quoting 2008 PA at 11) (emphasis added). Its illustrative examples include "[r]epainting in the same color as existing, or in similar colors or historic colors based upon an approved historic structure report, cultural landscape report, or a historic paint color analysis." *Id.* (quoting 2008 PA at 11). For undertakings outside those limits, the standard Section 106 process governs.

## B.    The National Environmental Policy Act

The National Environmental Policy Act ("NEPA") "ensures that the agency and the public are aware of the environmental consequences of proposed projects." *Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*, 605 U.S. 168, 177 (2025). An agency must prepare an environmental impact statement for any proposed action with "a reasonably foreseeable significant effect on the quality of the human environment," 42 U.S.C. § 4336(b)(1), or an environmental assessment where the significance of the effect is unknown or not reasonably foreseeable, *id.* § 4336(b)(2). An agency

4

may forgo both only if the action falls within a categorical exclusion, that is, "a category of actions that a Federal agency has determined normally does not significantly affect the quality of the human environment." *Id.* §§ 4336(a)(2), 4336e(1). Even then, the Department of the Interior's regulations bar reliance on a categorical exclusion where "extraordinary circumstances" exist, including where the action may have significant impacts on "park . . . lands" or "on properties listed, or eligible for listing, on the National Register of Historic Places." 43 C.F.R. § 46.215(b), (f). Where no exclusion properly applies, "the proposed action must be analyzed in an environmental assessment or environmental impact statement." 43 C.F.R. § 46.205(a).

## II.    FACTUAL AND PROCEDURAL BACKGROUND

### A.    The Reflecting Pool's Character-Defining Design

The Lincoln Memorial Reflecting Pool was constructed between 1919 and 1924 as a central element of the McMillan Commission's plan for the National Mall, connecting the Lincoln Memorial with the Washington Monument. FAC ¶¶ 39, 41. The pool and its surrounding landscape are listed on the National Register of Historic Places as components of the National Mall Historic District. FAC ¶ 42. The pool's defining feature is its function as a mirror. That function was engineered, not incidental: the original waterproofing base—an asphalt-coated membrane, slate, and concrete tile—was selected through trial and error for its dark coloration, because "the dark color of the tile created the illusion of greater depth and a more profound reflection." FAC ¶¶ 2, 43 (quoting 1999 Cultural Landscape Report at 33). When NPS rebuilt the pool in 2010-2012, it poured dark-tinted concrete for the same reason. Griess Decl. ¶ 11, ECF No. 12-1 ("The new concrete was dark tinted to enhance the reflection of the pool.").

### B.    The Resurfacing Project

On November 26, 2025, the President posted a video of the Reflecting Pool with the

message: "This is the Lincoln Memorial Reflecting Pool before Secretary of the Interior Doug Burgum and I fix it. Study it hard because you won't be seeing this Biden filth and incompetence much longer!" FAC ¶ 44.

The project that followed was awarded through a $6.9 million no-bid contract to Atlantic Industrial Coatings, a company that had performed work at the President's golf club in Sterling, Virginia. FAC ¶ 49. The administration invoked an urgent-circumstances exemption from ordinary contracting rules because the President "wanted it changed for the country's birthday party on July 4." *Id.* The firm that performed the 2010–2012 rehabilitation had declined the project, deeming "unfeasible" its two defining requirements: that the pool bottom be blue, and that the work be finished by July 4, 2026. FAC ¶ 51. The contract's cost ultimately approached $15 million. FAC ¶ 50.

Work on the project began in mid-April 2026 without public notice. FAC ¶ 46. The President announced the project at an April 23 Oval Office event, describing the contractor as "unbelievable at doing swimming pools" and explaining that he had wanted turquoise "like in the Bahamas" before settling on a color called "American flag blue." FAC ¶ 47.

No Section 106 consultation was initiated. No consulting parties were identified or notified; no information was provided to the public; no opportunity for comment was offered, before work began or since. FAC ¶ 63. NPS's Planning, Environment & Public Comment website—which hosts approximately twenty planning documents for the 2009–2012 rehabilitation of the same pool, including meeting notices, environmental assessment materials, and submissions to the Commission of Fine Arts and the National Capital Planning Commission—contains no entry for this project. FAC ¶¶ 64–65. Nor did Defendants submit the project to the Commission of Fine Arts, which has reviewed design changes to the Reflecting Pool and its surroundings for over a

6

century. FAC ¶ 73.

The failure to initiate a Section 106 process was not for lack of trying—by TCLF and others. On April 27, 2026, TCLF emailed NPS to inquire whether a Section 106 review would precede the change to a character-defining feature of a National Register property. FAC ¶ 66. On May 5, TCLF requested consulting-party status in any Section 106 proceeding relating to the project. FAC ¶ 67. Defendants never responded to either inquiry. *Id.* On April 28, the District of Columbia State Historic Preservation Office—having learned of the project from news reports—wrote to NPS expressing its view that the project did not qualify for streamlined review, because that process is reserved for in-kind replacement work that does not alter the historic character of the property. FAC ¶ 70.

Plaintiffs eventually learned—through this lawsuit—that the administration skipped the required NHPA and NEPA reviews by relying on exceptions for routine maintenance. As to the NHPA, the agency invoked the "streamlined" review process under the 2008 PA. FAC ¶ 69. However, the agency's own documents state that the project was "not eligible" for streamlined review, and that it was nonetheless used due to "the direction provided by" National Park Service, Department of the Interior, "and White House leadership coupled with the timeline required to complete compliance." FAC ¶ 45. As to NEPA, the agency invoked a categorical exclusion for "routine maintenance and repairs to cultural resource sites." FAC ¶¶ 74–75.

**C. Purported Completion, Failure, and Ongoing Remediation**

Plaintiffs filed this suit and moved for emergency relief on May 11, 2026. ECF Nos. 1 & 2. After briefing and argument, Defendants notified the Court on June 3 that the resurfacing was "complete," with refilling to begin by June 7. ECF No. 18; FAC ¶ 54. The President announced that the pool had been resurfaced with a "sophisticated material, industrial strength, that could last

for 100 years," and that "[t]his will be the first time since the day it was built, 1922, that it has worked, and worked wonderfully, indeed!" FAC ¶ 55 & n.14. Plaintiffs withdrew their request for emergency relief but maintained their underlying challenge to the resurfacing. ECF No. 19.

Within days of being filled, a green algal bloom overtook the pool; Defendants responded by pouring chemicals into the water. FAC ¶ 56. The blue coating then began peeling away in chunks. *Id.* Dead ducklings were found in and near the pool. FAC ¶ 58. On June 17, Mr. Birnbaum visited and observed the pool filled with algae, with workers piping pool water into a nearby drain. FAC ¶ 57. On June 22, TCLF contacted NPS to ask whether any Section 106 review would precede the remediation work; again, no response. FAC ¶ 68. Defendants have since announced that additional work will be performed on the pool after the July 4 holiday. FAC ¶ 60; ECF No. 22-1 at 2. It is not clear what reviews, if any, Defendants have conducted for that remediation work. FAC ¶ 69.

### D. Plaintiffs and Their Injuries

TCLF is a nonprofit organization founded in 1998 and headquartered in Washington, D.C., dedicated to education about and stewardship of historic designed landscapes. FAC ¶ 14. As part of that mission, TCLF has an established practice of participating as a consulting party in Section 106 proceedings regarding projects that threaten historically significant designed landscapes. FAC ¶ 15. TCLF has previously requested and obtained consulting-party status for undertakings in the National Mall area, including the White House Visitor Screening Facility and Lafayette Park. *Id.* Its engagement with the Lincoln Memorial Grounds is longstanding and documented. FAC ¶ 71. As to the resurfacing project specifically, TCLF has attempted to engage with NPS on numerous occasions to initiate the Section 106 review process and become a consulting party. FAC ¶¶ 66-68. NPS ignored those communications and failed to provide any information about

the resurfacing project until this litigation was filed. FAC ¶¶ 67, 69.

Charles Birnbaum is TCLF's founder, President, and CEO. FAC ¶ 18. From 1992 to 2007 he coordinated NPS's Historic Landscape Initiative and authored *The Secretary of the Interior's Standards for the Treatment of Historic Properties with Guidelines for the Treatment of Cultural Landscapes*—the governing federal framework for the treatment of historic landscapes, including these grounds. *Id.* The Reflecting Pool has been a cherished part of his personal life in Washington: during the COVID-19 pandemic he found particular solace walking around the Lincoln Memorial and the pool, and the grounds have since been his go-to place for walking, reflecting, and taking respite from work. FAC ¶ 19. When not traveling, he visits approximately once a month and plans to continue doing so. *Id.* Since this lawsuit was filed, his visits have been "a materially worse experience due to Defendants' alteration of the historic structure." FAC ¶ 18. The resurfacing has degraded the aesthetic experience of a landscape whose character he has documented, championed, and personally appreciated for decades—through the alteration of its character-defining features and through the resulting defects, including uneven coloration, chipped paint, and algae. FAC ¶ 20.

## LEGAL STANDARD

"To bring suit, a plaintiff must plead an injury in fact attributable to the defendant's conduct and redressable by the court." *Tyler v. Hennepin Cnty., Minnesota*, 598 U.S. 631, 636 (2023). On a motion to dismiss, the court "take[s] the facts in the complaint as true." *Id.* "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim." *Lujan v. Def. of Wildlife*, 504 U.S. 555, 561 (1992) (cleaned up). Standing is assessed independent of the merits. *See Warth v. Seldin*, 422 U.S. 490, 500 (1975). Accordingly, in evaluating jurisdiction, the Court assumes that the plaintiff's claims are

meritorious. *City of Waukesha v. EPA*, 320 F.3d 228, 235 (D.C. Cir. 2003).

Two further principles frame the analysis. A plaintiff who has been "accorded a procedural right to protect his concrete interests can assert that right without meeting all the normal standards for redressability and immediacy," *Lujan*, 504 U.S. at 572 n.7, and need only "show that the procedural step was connected to the substantive result," *Sugar Cane Growers Coop. of Fla. v. Veneman*, 289 F.3d 89, 94-95 (D.C. Cir. 2002). And where multiple plaintiffs seek the same relief, "only one plaintiff needs standing for a suit to proceed." *Bost v. Ill. State Bd. of Elections*, 607 U.S. 71, 76 n.3 (2026).

## ARGUMENT

## I.     PLAINTIFF BIRNBAUM HAS SUFFERED AN AESTHETIC INJURY

A plaintiff suffers an injury in fact when he "use[s] the affected area" and is among those "for whom the aesthetic and recreational values of the area will be lessened by the challenged activity." *Friends of the Earth v. Laidlaw Env't Servs.*, 528 U.S. 167, 183 (2000). "[T]he desire to use or observe" a feature of the natural or built environment, "even for purely esthetic purposes, is undeniably a cognizable interest for purpose of standing." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 562–63 (1992). "The key requirement . . . is that the plaintiff ha[s] suffered his injury in a personal and individual way—for instance, by seeing with his own eyes the particular animals whose condition caused him aesthetic injury." *Animal Legal Def. Fund v. Glickman*, 154 F.3d 426, 433 (D.C. Cir. 1998).

Under this standard, this is not a close case. Mr. Birnbaum does not glimpse the Reflecting Pool in passing; he uses it frequently, deliberately, and repeatedly for the precise contemplative purposes the landscape was designed to serve. FAC ¶ 19. The resurfacing project replaced the character-defining feature of the pool—the achromatic, concrete basin—with a blue-tinted

10

swimming pool liner. FAC ¶¶ 20, 43, 61. His continued use of the site on materially degraded terms, FAC ¶¶ 18-20, is a paradigmatic aesthetic injury under *Laidlaw*.

Defendants' arguments to the contrary misread the law and mischaracterize the facts alleged in the First Amended Complaint. Starting with the law, Defendants assert that a plaintiff must "identify how they will have to 'alter [their] behavior' as a result of the defendant's conduct" to show an aesthetic injury. Mot. at 9 (quoting *Env't Def. Fund v. FERC (EDF)*, 2 F.4th 953, 969–70 (D.C. Cir. 2021)). But there is no such freestanding requirement for aesthetic injury. For example, in *Glickman*, the D.C. Circuit held that a plaintiff asserted a cognizable aesthetic injury from observing animals kept in inhumane conditions in a zoo even though the plaintiff continued to visit the zoo at issue. 154 F.3d at 431. Similarly, in *Humane Soc'y of U.S. v. Hodel*, 840 F.2d 45, 52 (D.C. Cir. 1988), plaintiffs who used a wildlife refuge for recreational purposes asserted a cognizable aesthetic injury from being forced "to witness animal corpses and environmental degradation" resulting from hunting, without ever alleging that they changed their conduct in any way. Defendants are thus wrong to suggest that Mr. Birnbaum's intention to continue to visit the Reflecting Pool in the future despite their alteration somehow undermines his injury. All that he is required to plead is that the "aesthetic and recreational values of the area will be lessened by the challenged activity," *Laidlaw*, 528 U.S. at 183, and that he "suffered his injury in a personal and individual way," *Glickman*, 154 F.3d at 433. This he has clearly done. *See* FAC ¶ 19 (Mr. Birnbaum's history and future intent to visit the pool), ¶ 20 (Defendants' changes to the pool have degraded Mr. Birnbaum's enjoyment of the pool), ¶ 88 (same).

Defendants are also wrong to compare Mr. Birnbaum to the plaintiff in *EDF*, who did not have standing. Defendants assert that the plaintiff in *EDF* "had a stronger case for standing than Mr. Birnbaum" because he visits only "approximately once a month," whereas the plaintiff in *EDF*

would drive past the "eyesore" at issue "several times per week" and lived "half a mile away from the challenged project." Mot. at 11. But the question is not where the plaintiff lives or whether he visits a location monthly, weekly, or at some other interval. *See, e.g.*, *Am. Fuel & Petrochemical Manufacturers v. Env't Prot. Agency*, 937 F.3d 559, 593 (D.C. Cir. 2019) (finding standing for a plaintiff who visited the area at issue "several times per year"). The pertinent inquiry, instead, is whether the plaintiff can show that his aesthetic enjoyment of *something* has been affected by Defendants' activity. *Laidlaw*, 528 U.S. at 183; *Glickman*, 154 F.3d at 433. The plaintiff in *EDF* lacked standing because she could not make that required showing: she "never allege[d] that she used and enjoyed the land" where the challenged project occurred, "that she intended to use the land in the future," or "how she derived aesthetic value from the land as it had existed before the construction." 2 F.4th at 969. In contrast to the *EDF* plaintiff who was merely occasionally driving by a particular site, Mr. Birnbaum has shown both that he has derived aesthetic enjoyment from the Reflecting Pool specifically and would like to do so in the future, FAC ¶ 19, and that Defendants' alteration of the pool has "degraded" his experience by "alteration of its character-defining features and the resulting defects," FAC ¶ 20. *See also* FAC ¶ 18 (explaining that Mr. Birnbaum's recent visits have been a "a materially worse experience due to Defendants' alteration of the historic structure").

Defendants also cite so-called offended-observer cases, but these are farther afield still. *Valley Forge Christian Coll. v. Americans United for Separation of Church & State*, 454 U.S. 464, 485 (1982), and its progeny involved plaintiffs whose only connection to the challenged conduct is ideological disagreement with government action affecting someone or something else. But Mr. Birnbaum is not asserting an abstract, ideological disagreement. The government altered the physical features of a landscape he personally uses. FAC ¶¶ 18-20. That is not a mere

"psychological consequence . . . produced by observation of conduct with which one disagrees," *Valley Forge*, 454 U.S. at 485; it is the lessening of "the aesthetic and recreational values of the area" for a person who uses the area—the interest *Laidlaw* squarely protects. 528 U.S. at 183.[1]

Defendants' next move is to recast Mr. Birnbaum's injury as merely an interest in "not observing something he dislikes" rather than a deprivation of his ability to observe "something." Mot. at 11. Thus, Defendants offer the absurd proposition that Mr. Birnbaum has no standing because "he can avert his gaze to the Lincoln Memorial during his monthly visits." *Id*. at 12. There are many things wrong with this argument. First, Mr. Birnbaum *has* been deprived of the ability to observe something: the historic, achromatic basin in its pre-alteration state. FAC ¶ 43. In that sense, Defendants' hypothetical of cutting a forest, Mot. at 11, *is* exactly like this case: due to Defendants' actions, Mr. Birnbaum cannot enjoy the Reflecting Pool as it once was. The fact that there are other structures on the National Mall that Mr. Birnbaum might enjoy is quite beside the point. "A government that takes three limbs but spares the last imposes an injury all the same." *First Choice Women's Res. Centers, Inc. v. Davenport*, 146 S. Ct. 1114, 1129 (2026). The question is not how severe Plaintiffs' injury is, but whether it exists at all. *Id.*; *accord, e.g.*, *Uzuegbunam v. Preczewski*, 592 U.S. 279, 292 (2021) (holding that $1 is sufficient for standing); *Ctr. for Biological Diversity v. Zeldin*, 171 F.4th 356, 374 (D.C. Cir. 2026) (finding plaintiff had aesthetic standing based on interest in "minimizing the loss of protected species"); *Carpenters Indus. Council v. Zinke*, 854 F.3d 1, 5 (D.C. Cir. 2017) (Kavanaugh, J.) (holding, in the context of economic injury, "the amount [of injury] is irrelevant").

---

[1] In their kitchen-sink approach, Defendants also argue that Mr. Birnbaum's injuries are not cognizable because they are "purely psychic in nature." Mot. at 10. Not so. The Supreme Court has made clear that Article III harm need not be physical. *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 425 (2021) ("[I]ntangible harms can also be concrete.").

Second, Mr. Birnbaum is not complaining about the alteration of just any random structure, but a structure of national and personal significance. The Reflecting Pool is a treasured landmark on the National Register of Historic Places. FAC ¶ 42. It has been a cherished part of his personal life in Washington, D.C. FAC ¶ 19. And his training as a landscape architect with deep experience in historic preservation gives him a heightened appreciation for the specific design qualities that make the Reflecting Pool significant. FAC ¶ 20. It denigrates the significance of the Reflecting Pool to suggest that the preservation of other structures eliminates the very real injury from being deprived the opportunity to view the Reflecting Pool in its pre-project splendor.

Defendants are similarly wrong to assert that Mr. Birnbaum's definition of injury would "confer standing on anyone who dislikes the appearance of any feature on federal property." Mot. at 12. Mr. Birnbaum routinely visited the Reflecting Pool for personal enjoyment, but Defendants' actions are frustrating him from continuing to do so. FAC ¶¶ 19-20. This is entirely different from someone who, in the abstract, claims to dislike some feature on federal property. Furthermore, even if many people could theoretically assert a similar injury with respect to the Reflecting Pool, that does not diminish Mr. Birnbaum's injury. A harm "shared by the many" is still an injury in fact where, as here, it is concrete and particularized to the plaintiff's own use. *Sierra Club v. Morton*, 405 U.S. 727, 734-35 (1972) ("Aesthetic and environmental well-being, like economic well-being, are important ingredients of the quality of life in our society, and the fact that particular environmental interests are shared by the many rather than the few does not make them less deserving of legal protection through the judicial process."); *accord, e.g., Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 n.7 (2016) ("The fact that an injury may be suffered by a large number of people does not of itself make that injury a nonjusticiable generalized grievance."); *Campaign Legal Ctr. v. Fed. Election Comm'n*, 31 F.4th 781, 789 (D.C. Cir. 2022) ("[T]he fact that other citizens or

14

groups of citizens might make the same complaint ... does not lessen [plaintiffs'] asserted injury" (quoting *FEC v. Akins*, 524 U.S. 11, 24-25 (1998)).

Finally, although a plaintiff need only establish a "demonstrable risk" to their interests, *Am. Fuel & Petrochemical Manufacturers v. Env't Prot. Agency,* 937 F.3d 559, 594 (D.C. Cir. 2019), Mr. Birnbaum's injury has actually occurred and is in existence right now. Defendants argue that Mr. Birnbaum complains of a "work in progress" whose defects NPS intends to repair. Mot. at 12; *but see id.* at 16 ("[T]he work is complete."). Defendants offer no authority for the proposition that a Plaintiff suffering an injury *today* nevertheless lacks standing based on what Defendants claim they "intend[]" to be the state of the world in the future. *See id.* at 12.[2] In any event, Defendants' argument ignores that Mr. Birnbaum alleges harm from "Defendants' alteration of [the pool's] character-defining features *and* the resulting defects." FAC ¶ 20 (emphasis added). The peeling and algae aggravate the injury; they do not constitute it. Repairing the blue coating will not restore the achromatic basin. Even a defect-free blue pool inflicts the aesthetic injury, and Mr. Birnbaum "will continue to suffer this aesthetic injury unless and until the historic character of the pool is restored." *Id.* This easily confers standing on Mr. Birnbaum.

## II.   TCLF HAS SUFFERED AN INJURY TO CONCRETE INTERESTS

Because Mr. Birnbaum's aesthetic injury is sufficient by itself to support jurisdiction over both claims, the Court can stop here. *Rumsfeld v. FAIR*, 547 U.S. 47, 52 n.2 (2006). But TCLF independently has standing too. Although "a bare procedural violation" that causes no other injury does not supply standing, the "violation of a procedural right granted by statute can be sufficient

---

[2] Furthermore, even though NPS "intends to repair" the issues with the new coating, Mot. at 12, it is once again plowing ahead without any reviews and expert input. And considering that the issues with the new liner were a consequence of Defendants' defective process, FAC ¶ 59, there is every reason to think that problems will continue to plague the pool.

in some circumstances to constitute injury in fact." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 342 (2016). A litigant suffers a cognizable injury when the government denies it a procedural protection that affects the litigant's concrete interests. *Lujan*, 504 U.S. at 572 n.7. "An agency's failure to meet its statutory consultation requirement is the 'archetypal procedural injury.'" *Ctr. for Biological Diversity v. Zeldin*, 171 F.4th 356, 374 (D.C. Cir. 2026) (quoting *Ctr. for Biological Diversity v. EPA*, 861 F.3d 174, 182 (D.C. Cir. 2017)). Section 106 creates exactly such protections: it directs the agency to consider written requests to participate as a consulting party, 36 C.F.R. § 800.2(c)(5), 800.3(f)(3), and to provide the public with information about the undertaking and an opportunity to comment, *id.* §§ 800.2(d), 800.11. Similarly, NEPA review "ensures that the agency and the public are aware of the environmental consequences of proposed projects." *Eagle Cnty.*, 605 U.S. at 177. Defendants afforded TCLF neither. FAC ¶¶ 17, 63, 66-68. That failure harmed concrete interests at the core of the Foundation's work — its interest in the information these reviews generate and its interest in the preservation of cultural landscapes. Those are not abstract or academic concerns, Mot. at 13; they are the very reason Section 106 and NEPA exist.

Defendants characterize TCLF's injury as a procedural harm without a tie to "anything concrete." Mot. at 13-14. That description ignores the ways in which Defendants' procedural violation has harmed the Foundation.

First, TCLF's programmatic work depends on, and is enriched by, the information made available through the federal historic preservation and environmental review processes. FAC ¶ 17. Pursuant to 36 C.F.R. § 800.11, the agencies are required to document any "determination, finding, or agreement" made under Section 106. When NPS conducts the standard Section 106 and NEPA reviews, it generates a trove of information, including detailed presentations about the project

16

options the agency considered, materials from meetings with consulting parties, and communications with other agencies. *See* FAC ¶ 64 & link referenced therein.[3] By skipping this review, Defendants withheld the documentation that a lawful process for this undertaking would have produced. It is well established that a plaintiff has standing if "the legal ruling they seek might lead to additional factual information that, on their view of the law, [the law] requires the [agency] to make public." *Campaign Legal Ctr. v. Fed. Election Comm'n*, 31 F.4th 781, 788 (D.C. Cir. 2022); *accord, e.g.*, *Akins*, 524 U.S. at 21 (describing the injury in fact as plaintiff's "inability to obtain information . . . that . . . the statute requires" be made public). That concrete informational injury imposed a special harm on TCLF, which uses this information to shape its activities and further its mission. *People for the Ethical Treatment of Animals v. USDA ("PETA")*, 797 F.3d 1087, 1094 (D.C. Cir. 2015) (denial of information an organization uses in its programmatic activities, coupled with perceptible impairment of those activities, is a cognizable organizational injury). This is a concrete informational injury, not a mere desire to disseminate information. Mot. at 14 (citing *Found. on Econ. Trends v. Lyng*, 943 F.2d 79, 84–85 (D.C. Cir. 1991)).

Second, TCLF has a demonstrated interest in protecting threatened historically significant designed landscapes—an interest it has vindicated repeatedly through the Section 106 process, including for undertakings in the National Mall area. FAC ¶ 15. TCLF does not participate as an academic exercise; it does so to protect historic properties, FAC ¶ 17.[4] Defendants' failure to initiate the process denied TCLF the ability to participate, whether as a consulting party or as a

---

[3] TCLF draws on exactly that kind of information in its educational and stewardship programs; its digital *Cultural Landscapes Guide to D.C. Modernism*, for instance, was funded as a remediation measure resolving the Pershing Park Section 106 undertaking. Birnbaum Decl. ¶ 11, ECF No. 2-1.

[4] Indeed, TCLF's participation in the Section 106 process has contributed to the saving of numerous cultural landscapes. Birnbaum Decl. ¶ 7.

member of the public,[5] FAC ¶¶ 17, 63, and thus impaired TCLF's ability to fulfill its core advocacy and stewardship mission of protecting cultural landscapes, *see PETA*, 797 F.3d at 1094 (USDA policy "perceptibly impaired" organization's work by denial of process organization used to do that work). What happened to the Reflecting Pool illustrates the stakes: because TCLF and other stakeholders were sidelined, Defendants altered a historic landmark without the expert input the process exists to surface, with the results the pool now displays. FAC ¶¶ 45, 59.

In sum, Defendants' failure to conduct the mandatory reviews is not an abstract procedural injury but a concrete and perceptible harm to TCLF's work.

## III. PLAINTIFFS' INJURIES ARE REDRESSABLE

Should Plaintiffs prevail on the merits, the Court can provide a remedy that will ameliorate the harms described above.

Three high-level principles set the stage, and underscore why the injuries Plaintiffs suffered are redressable. *First*, Defendants do not and cannot dispute causation, *i.e.*, that their challenged actions caused Plaintiffs' harms, *see* Mot. 15-16, and "causation and redressability, are usually 'flip sides of the same coin.'" *Diamond Alternative Energy, LLC v. Env't Prot. Agency*, 606 U.S. 100, 111 (2025). That is because, if "a defendant's action causes an injury, enjoining the action . . . will typically redress that injury." *Id.* (quotation marks omitted). *Second*, in the redressability context, "'procedural rights' are special: The person who has been accorded a procedural right to protect his concrete interests can assert that right without meeting all the normal standards for redressability." *Lujan v. Def. of Wildlife*, 504 U.S. 555, 572 n.7 (1992). *Third*, a partial remedy is

---

[5] The fact that TCLF is not guaranteed consulting party status, Mot. at 13, does not affect the standing inquiry. *See Waukesha*, 320 F.3d at 235 (court must assume Plaintiffs will prevail on merits to assess standing). This is especially true because under the regulations, NPS must provide information and seek input from the public, 36 C.F.R. § 800.2(d)(1)–(2), and TCLF can participate in the process and protect historic landscapes as a member of the public.

still a remedy: a court decree need not eliminate completely a plaintiff's injury for the case to be justiciable. *Diamond Alternative Energy,* 606 U.S. at 114.

Applying those principles here easily demonstrates that Plaintiffs have satisfied Article III's redressability requirement. The relief requested in Plaintiffs' amended complaint targets precisely the agency actions that have caused them harm.[6] Thus, among other things, Plaintiffs ask the Court to set aside Defendants' decision, direct Defendants to follow the appropriate procedures, and stop Defendants from making further changes based on a flawed rationale. These are classic judicial remedies for unlawful agency action. Thus, it is a familiar concept that invalidating unlawful agency action that harmed a plaintiff and requiring further process will typically redress a plaintiff's injury. *E.g.*, *Am.'s Cmty. Bankers v. F.D.I.C.*, 200 F.3d 822, 829 (D.C. Cir. 2000). Similarly, "[i]f a defendant's action causes an injury, enjoining the action . . . will typically redress that injury." *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 381 (2024).

Defendants do not and cannot challenge redressability at large, but argue that "Plaintiffs have failed to establish that either the requested injunction or further process *would* redress any of their supposed harms." Mot. at 16 (emphasis added). Once more, Defendants are wrong on the law and wrong on the facts.

The law first. Defendants' motion seems to contend that Plaintiffs must demonstrate that the agency *will* reach a different conclusion if forced to follow the procedures Congress requires. That flies in the face of long-settled precedent and the structure of judicial review of administrative actions. *See, e.g.*, *Lujan*, 504 U.S. at 572 n.7 (noting that a plaintiff injured by an agency's grant of a license "has standing to challenge the licensing agency's failure to prepare an environmental

---

[6] Under Rule 54, Plaintiffs are not limited to the specific forms of relief sought in the complaint. Fed. R. Civ. P. 54(c) ("[F]inal judgment should grant the relief to which each party is entitled, even if the party has not demanded that relief in its pleadings.").

19

impact statement, even though he cannot establish with any certainty that the statement will cause the license to be withheld or altered"). Even when it is "uncertain" whether the required process would have led to a different agency decision, there is "no uncertainty" that a plaintiff who shows an injury in fact can challenge the agency's choice to move ahead without those procedures. *See Dep't of Educ. v. Brown*, 600 U.S. 551, 566 (2023) (citing *Summers v. Earth Island Inst.,* 555 U.S. 488 (2009)); *accord, e.g.*, *Bost v. Ill. State Bd. of Elections*, 607 U.S. 71, 80 (2026) ("Interest in a fair process does not depend on the actual result."); *Beyond Nuclear, Inc. v. U.S. Nuclear Regul. Comm'n*, --- F.4th ----, 2026 WL 2093882, at \*2 (D.C. Cir. July 21, 2026) (finding redressability satisfied by order "requir[ing] the [Defendants] to revisit [their prior] determinations before relying on them" in light of "*potential* consequences for future [agency] decisions" (emphasis added)). The "relaxed redressability requirement" for procedural injuries "is met when correcting the alleged procedural violation *could* still change the substantive outcome in the petitioner's favor; the petitioner need not go further and show that it *would* effect such a change." *Narragansett Indian Tribal Historic Pres. Office v. FERC*, 949 F.3d 8, 13 (D.C. Cir. 2020) (emphasis added). Defendants' demand that Plaintiffs identify a guaranteed "real-world impact," Mot. at 16, imposes an outcome-certainty standard the law does not require.

Under the correct standard, Plaintiffs can easily establish redressability: Were Defendants to conduct the required reviews and engage with Plaintiffs and other stakeholders before any further work on the Reflecting Pool, the result is more likely to align with the historic preservation values that undergird Mr. Birnbaum's aesthetic enjoyment of the pool and that TCLF works to protect. *See* FAC ¶ 20 (explaining that Mr. Birnbaum's aesthetic enjoyment was affected by the alteration of the pool's historic character-defining features), ¶ 17 (TCLF's participation would enable it to provide its expertise regarding the pool's character-defining features), ¶ 15 (TCLF

20

participates in reviews to protect historic landscapes); Birnbaum Decl. ¶¶ 6-7 (TCLF's participation has led to preservation of numerous historic landscapes).

The new review would also remedy the informational harms experienced by TCLF. Birnbaum Decl. ¶ 11. Defendants' cryptic assertion that TCLF purportedly "has all the information to which it was entitled," Mot. at 16, does not resolve the injury for several reasons. To start, to the extent that Defendants are arguing that Plaintiffs' informational injury is no longer redressable because they received the required information *due to this litigation*, *see* Mot. at 14, the argument is not one of standing at all. *See N. Am. Butterfly Ass'n v. Wolf*, 977 F.3d 1244, 1258 (D.C. Cir. 2020) ("DHS' standing argument is misplaced because the standing inquiry focuses on whether the plaintiff has demonstrated an injury at the outset of the litigation, so post-filing developments . . . do not undercut standing." (cleaned up)). Instead, the argument would be one of mootness, which places a "heavy burden" on *Defendants* to prove. *Id.* Moreover, the argument seems to assume that NPS was correct to only conduct a streamlined review, which is a merits question at the heart of this lawsuit. *See L.M.-M. v. Cuccinelli*, 442 F. Supp. 3d 1, 22 (D.D.C. 2020) (citing *Cutler v. U.S. Dep't of Health & Human Servs.*, 797 F.3d 1173, 1179-80 (D.C. Cir. 2015)) ("[C]ourts must assume, for purposes of assessing standing, that the Plaintiffs will prevail on the merits."). Furthermore, the information NPS has provided thus far was limited to the original resurfacing. NPS has so far provided no information about the subsequent remedial work, which is part of the agency action challenged in this lawsuit. FAC ¶¶ 60, 68, 78. So even on Defendants' theory of the case, they have not provided all the information that Plaintiffs are entitled to. *See Byrd v. United States EPA*, 174 F.3d 239, 244 (D.C. Cir. 1999) (holding "the tardy release of the documents does not render the case moot" when there remains ongoing dispute between the parties).

21

Nor is there any reason to doubt that an injunction would redress the harms that Plaintiffs face. "If a defendant's action causes an injury, enjoining the action . . . will typically redress that injury." *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 381 (2024); *Carpenters Indus. Council v. Zinke*, 854 F.3d 1, 6 n.1 (D.C. Cir. 2017). The injunction Plaintiffs requested is a logical and necessary extension of the process remedy: If proceeding without the required reviews caused Plaintiffs' injuries, and the reviews will ameliorate the injuries, any further work on the Reflecting Pool must wait until after the reviews are completed.

Defendants' speculation that an injunction would "prolong" Mr. Birnbaum's injury, Mot. 15–16, misconstrues both the injury and the relief sought. It is simply wrong to say that Mr. Birnbaum's sole "aesthetic concern with the Reflecting Pool is its current work-in-progress appearance." *Id.* at 16. Mr. Birnbaum's aesthetic injury—which stems both from the alteration of the Reflecting Pool's historic features as well as the defects in the resurfacing, FAC ¶¶ 20, 78— will not be entirely remedied by mere fixes of the current defects. And Plaintiffs do not ask the Court to freeze the pool in its current condition; they ask that further alteration await the reviews the law requires. FAC, Prayer ¶¶ (c) & (d). As explained above, those reviews are more likely to bring the Reflecting Pool into alignment with historic preservation and environmental principles than proceeding without them. As such, it is the *absence* of an injunction that would prolong and exacerbate Mr. Birnbaum's injury.

In a last-ditch effort to evade reviews, Defendants assert that the injuries are not redressable because "the work is complete and the analysis is done." Mot. at 16.[7] To start, the finality of an agency action cannot be an impediment to obtaining relief under the APA when it is, in fact, a pre-

---

[7] As with other redressability arguments, this argument appears to be better understood as mootness rather than standing.

22

condition of APA review. *See* 5 U.S.C. § 704. To the extent that Defendants are now arguing that they *cannot* reverse their actions, that would reflect a dramatic shift from Defendants' position during the preliminary relief stage of this litigation when they assured the Court that Plaintiffs' injuries could be remedied even after the resurfacing project is complete. *See* ECF No. 12 at 20 ("Plaintiffs' alleged aesthetic harm is reversible."). To wit, Defendants submitted a sworn declaration stating that, at minimum, the color of the pool could be changed later. *See* Griess Decl. ¶ 48, ECF No. 12-1.

In any event, the work on the project is far from "complete." Defendants have announced that additional work on the pool will occur after July 4. FAC ¶ 60 (citing ECF No. 22-1 at 2). Indeed, *on the very same page* that Defendants argue that "the work is complete," they *also* rely on the "current work-in-progress" status of the pool. Mot. at 16; *see also id.* at 12. There is thus an ongoing undertaking and agency action that is the subject of this litigation. *See* FAC ¶ 78 (defining the Reflecting Pool Project, including "subsequent remediation work," as the challenged agency action). Accordingly, the requested reviews "could still change the substantive outcome in [plaintiff's] favor." *Narragansett*, 949 F.3d at 13.

In sum, Plaintiffs have shown that they have standing to request both the process remedy and the injunction.

23

**CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully request that the Court deny Defendants'

motion to dismiss.

Dated: July 31, 2026                              Respectfully submitted,

                                                 /s/ Alexander Kristofcak
                                                 ALEXANDER KRISTOFCAK
                                                   (D.C. Bar No. 90045623)
                                                 JOSEPH MEAD
                                                   (D.C. Bar No. 1740771)
                                                 NATHANIEL A.G. ZELINSKY
                                                   (D.C. Bar No. 1724093)

                                                 WASHINGTON LITIGATION GROUP
                                                 1717 K Street NW, Suite 1120
                                                 Washington, DC 20006
                                                 Phone (202) 521-8734
                                                 Fax (202) 521-8745
                                                 akristofcak@washingtonlitigationgroup.org

                                                 *Attorneys for Plaintiffs*

24